MATTHEW DONALD UMHOFER, ESQ., SBN 206607
mumhofer@spertuslaw.com
DIANE H. BANG, ESQ., SBN 271939
**SPERTUS, LANDES & UMHOFER, LLP**
1990 S Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone: (310) 826-4700
Facsimile: (310) 826-4711

MARTIN P. MOROSKI, ESQ., SBN 98202
moroski@ammcglaw.com
CHASE W. MARTIN, ESQ., SBN 260444
**ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP**
Post Office Box 3835
San Luis Obispo, California 93403-3835
Telephone: (805) 543-0990
Facsimile: (805) 543-0980

Attorneys for Plaintiff

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW D. VAN STEENWYK, Individually, as Trustee and Beneficiary of The Matthew Van Steenwyk Gst Trust And The Matthew Van Steenwyk Issue Trust, And As Co-Trustee Of The Gretchen Marie Van Steenwyk-Marsh Gst Trust And The Gretchen Marie Van Steenwyk-Marsh Issue Trust and derivatively on behalf of Defendants APPLIED TECHNOLOGIES ASSOCIATES, INC., and ATA RANCHES, INC.<br><br>                    Plaintiff,<br><br>  vs.<br><br>KEDRIN E. VAN STEENWYK, Individually, as Successor Trustee of the | Case No.: 2:20-cv-02375 FMO (AFMx)<br><br>**THIRD AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>1. **BREACH OF FIDUCIARY DUTY;**<br>2. **CORPORATE WASTE;**<br>3. **ACCOUNTING;**<br>4. **DECLARATORY RELIEF;**<br><br>**THIRD AMENDED VERIFIED SHAREHOLDER DIRECT COMPLAINT FOR:**<br><br>5. **BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER;** |

1.

THIRD AMENDED COMPLAINT

Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust; PAMELA PIERCE, Individually; PHILIP GOBE, Individually; PHILIP LONGORIO, Individually; GENE DUROCHER, Individually; DANIEL CARTER, Individually; JOSEPH MCCOY, Individually; ELIZABETH A. VAN STEENWYK, Individually, and as Original Trustee and as Beneficiary of the Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust; ADELAIDA CELLARS, INC., a California Corporation; and DOES 2-10, inclusive,

Defendants,

and

APPLIED TECHNOLOGIES ASSOCIATES, INC., and ATA RANCHES, INC.

Nominal Defendants

**6. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER;**

**7. PRODUCTION OF CORPORATE RECORDS.**

**JURY TRIAL DEMANDED**

Plaintiff Matthew Van Steenwyk ("Plaintiff"), Individually, as Trustee and Beneficiary of The Matthew Van Steenwyk GST Trust and The Matthew Van Steenwyk Issue Trust ("Matthew's Trusts"), and as Co-Trustee of The Gretchen Marie Van Steenwyk-Marsh GST Trust and The Gretchen Marie Van Steenwyk – Marsh Issue Trust ("Gretchen's Trusts") (referred to collectively at times as "Plaintiff's Trusts"), and derivatively on behalf of Defendant Applied Technologies Associates, Inc. ("ATA") and Defendant ATA Ranches, Inc., brings this action against Defendants Kedrin E. Van Steenwyk, Pamela Pierce, Phillip Gobe, Phillip Longorio, Gene Durocher, Daniel Carter, and Joseph McCoy

2.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

(referred to collectively at times as "Director Defendants") for violations of California common law setting forth the duties of corporate officers and directors. Plaintiff also brings this action against Defendant Elizabeth A. Van Steenwyk ("Elizabeth"), and Defendant Kedrin E. Van Steenwyk ("Kedrin") as Trustee and Successor Trustee of the Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust, as owner of Class A shares in ATA for violations of their duties as the holder of all voting shares in ATA.  Plaintiff also brings direct claims against Elizabeth, Kedrin, the Director Defendants and Defendant Adelaida Cellars, Inc. for breach of fiduciary duties owed by ATA's controlling shareholders to Plaintiff, or for the aiding and abetting those breaches owed to Plaintiff.  From Defendant Adelaida Cellars, Inc., Plaintiff seeks the return of property and money that was improperly transferred to it as a result of the breaches of duties of Elizabeth, Kedrin, the Director Defendants, or some of them.

## INTRODUCTION

1.  At all times relevant, the Director Defendants, Defendant Elizabeth and Defendant Kedrin stood in fiduciary relationships to Plaintiff and owed Plaintiff fiduciary duties.

2.  ATA is a technology development and sales organization founded in the late 1960's.  The company develops and markets drilling navigation systems for the oil and gas industry.

3.  Defendant Adelaida Cellars, Inc. ("Adelaida") is a winery located in Paso Robles, California.  Don and Elizabeth Van Steenwyk, Plaintiff's parents, purchased Adelaida in 1990 and thereafter transferred ownership of the winery to ATA.  Prior to January 2013, ATA owned Adelaida and its wine operations, as well as ranches known as "HMR Ranch" and "Viking Ranch" where wine grapes used by Adelaida were grown.

4.  The origin of this case began in January 2013 when Adelaida was sold

3.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

by ATA to KMBG, LLC ("KMBG") as a result of a non-arm's-length, one-sided transaction (hereinafter referred to as the "2013 Sale"). At that time, KMBG purchased all of ATA's stock in Adelaida for substantially less than market value. However, KMBG did not purchase the ranch properties on which the grapes for Adelaida's winery were grown. As a result, KMBG emerged from the deal with the potential revenue generating side of Adelaida's wine-making business, without the cost side of the business, which included the planting, raising, harvesting, and shipping of wine grapes. Those costs remained with ATA. Plaintiff was not informed of the terms of the 2013 Sale at the time that sale was transacted. In fact, Plaintiff only discovered the details of the 2013 Sale, specifically the aspects that were prejudicial to ATA and ATA's minority shareholders, through discovery in this case.

5.      KMBG is a Colorado company owned almost entirely by Elizabeth Van Steenwyk ("Elizabeth") through her trusts. Elizabeth, through her trusts, is also the owner of all Class A voting shares in ATA. This makes her, or whoever is acting on her behalf, both the controlling shareholder of ATA, and the near-total owner of KMBG.

6.      Plaintiff is trustee of Matthew's Trusts and Gretchen's Trusts, the two sets of trusts that are minority shareholders of ATA with no voting rights. Gretchen's Trusts own no interest in KMBG. Matthew's Trusts essentially hold no interest in KMBG.[1]   Defendant Kedrin, on the other hand, is the current controlling shareholder of ATA and the controlling member of KMBG. Kedrin also stands to inherit a majority, if not all, of KMBG's assets when Elizabeth passes.

---

[1] Matthew's Trusts' membership interest in KMBG is a de minimis 0.17%. It is so small that, according to counsel for Adelaida Cellars, it does not even entitle Plaintiff to examine the books and records of that entity pursuant to a Corporations Code section 1601 request.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1    7.    As a result of the change of ownership of Adelaida following the 2013

2    Sale, all transactions between ATA and Adelaida from 2013 onwards should have

3    been at arm's-length and for fair value.  Members of ATA's management, including

4    members of its Board of Directors, and ATA's controlling shareholder were

5    advised of this by internal accounting officers and outside legal counsel.  The

6    advice was ignored.

7    8.    The 2013 Sale and the documents memorializing it were the product

8    of breaches of fiduciary duties by Defendants Elizabeth, Kedrin, and certain other

9    directors and officers of ATA acting in concert with them.  The dealings and

10   transactions detailed below between ATA and Adelaida that occurred after the

11   2013 Sale, also constituted breaches of fiduciary duties, always substantially

12   benefitting Adelaida and its owner, KMBG, to the substantial detriment of ATA

13   and ATA's minority shareholders.

14   9.    The intent behind each of the one-sided transactions between ATA

15   and Adelaida detailed in this Complaint was and is to transfer substantial value

16   from ATA, an entity in which Plaintiff's Trusts own a financial interest, to

17   Adelaida, an entity in which Plaintiff's Trusts have no financial interest.  The

18   transactions described herein have resulted in significant financial damage to ATA

19   as a whole.  The transactions have also resulted in non-incidental direct damage to

20   Plaintiff's Trusts in that Elizabeth and Kedrin have paid themselves constructive

21   dividends by supporting Adelaida, thereby preventing ATA from declaring and

22   paying dividends to the minority shareholders, including Plaintiff's Trusts.

23   10.   After the 2013 Sale, ATA absorbed all of the losses associated with

24   operating Adelaida, but was prevented from sharing in any potential financial

25   upside.  Since 2013, ATA:

26        a.  Assumed all costs of operating HMR Ranch and Viking Ranch, on

27            which premium wine grapes used by Adelaida to make its wine were

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

5.

THIRD AMENDED COMPLAINT

grown.   These ranches experienced financial losses through the practice of forcing ATA to sell premium wine grapes to Adelaida at a fraction of their market value.  Plaintiff recently discovered that from 2013 through the end of 2016, this practice was implemented without a written contract.   Beginning in November 2016, the practice continued pursuant to a contract obtained through continuous fiduciary duty breaches by Defendant Kedrin and other defendants who aided and abetted her breaches.

b. Accepted late payments for the grapes it was forced to sell to Adelaida, or accepted the practice of paying a separate entity for the grapes.  In addition to the below market payments, Adelaida also directed payments for grapes to another entity, Stoneway Properties ("Stoneway").  Stoneway was and is controlled by the parties who abused their power over ATA to bring about this one-sided grape purchase arrangement, Defendants Elizabeth and Kedrin.

c.  Subsidized substantially all of Adelaida's costs of doing business, including paying for virtually all of Adelaida's employee, accounting, and legal costs, extending credit to Adelaida and its affiliates at zero or below-market interest rates, and paying for and/or advancing the costs of Adelaida's capital improvement projects.

11.   ATA's forced ownership of HMR Ranch and Viking Ranch has also caused ATA and its minority shareholders damages.  Had the properties been marketed and sold, significant capital would have been raised that could have been utilized to advance ATA's core oilfield business interests and/or distributed to the minority shareholders as dividends.  As it stands, *ATA has never issued dividends to Plaintiff.*

12.   Former officers of ATA advised Director Defendants and its

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

6.

THIRD AMENDED COMPLAINT

controlling shareholders that the transactions and dealings between ATA and Adelaida, after the 2013 Sale, were not arm's-length and were unfair to ATA's minority shareholders. This advice was ignored. Instead, in an effort to make ATA more attractive to other businesses potentially seeking to purchase ATA, ATA created ATA Ranches, Inc, a corporate entity whose sole purpose was to own ATA's money-losing ranch properties, with ATA pumping millions of dollars into ATA Ranches to pay for a building expansion and operating expenses associated with the ranches.

13. Director Defendants, Kedrin, Elizabeth, and those defendants who aided and abetted Kedrin's and Elizabeth's conduct alleged herein, understood that potential purchasers of ATA, an oilfield business, would not be interested in purchasing insolvent ranches along with ATA's core assets. ATA's and Kedrin's legal consultants analyzed whether keeping the ranches segregated from ATA's core business would make ATA easier to sell. ATA's former Vice President of Tax and its long-time outside legal counsel (Jackson Walker LLP) issued written opinions in 2018 that the spinoff of ATA's ranch properties to a wholly-owned subsidiary would likely not withstand IRS audit scrutiny. This advice was ignored. Without Plaintiff's knowledge, the ranch properties were spun off to ATA Ranches in 2018.

14. Defendant Kedrin's breach of fiduciary duties was motivated by one of two things: (1) she wanted to acquire the HMR and Viking Ranches for herself at a discount; or (2) barring Kedrin's acquisition of the ranches, she wanted to keep in place the arrangement by which ATA continued to subsidize Adelaida through its assumption of all costs associated with owning the ranches, growing wine grapes thereon, selling those grapes to Adelaida at below market rates, and subsidizing all other costs of the wine-making business. On information and belief, the most reasonable option of selling the ranches to a third-party buyer was never

7.

THIRD AMENDED COMPLAINT

considered, as this would have ended the subsidies that ATA provided Adelaida. Instead, Kedrin and the defendants who aided and abetted her, retained the system that had been in place since the 2013 Sale, which entailed ATA paying Adelaida's costs of doing business, loaning money to Adelaida and its affiliates for no or below market interest, and selling premium wine grapes to Adelaida at a fraction of their value.

15.   In the latter half of 2018, Kedrin, through attorneys paid for by ATA, attempted to purchase the ranches on terms favorable to her, and unfavorable to ATA.   During that time, Kedrin and her attorneys made representations to the minority shareholders in connection with Kedrin's proposal that raised serious questions about what Kedrin had done and what she was proposing to do to ATA. Those questions led, in turn, to Plaintiff's requests on behalf of the trusts he represents for ATA corporate information under California Corporations Code section 1601 in May 2019.   Inadequate responses by ATA led Plaintiff to suspect that Kedrin, Elizabeth, and Director Defendants were hiding things from Plaintiff. Discovery responses recently received by Plaintiff in this case have demonstrated that Plaintiff's suspicions are grounded in fact.

16.   The inadequate responses to the requests for corporate information led to Matthew's and Gretchen's demand to the ATA Board to take corrective action pursuant to California Corporations Code section 800.   This demand was denied.

17.   Plaintiff propounded requests for production of documents to defendants shortly after filing this case.   Defendants did not make a meaningful production of documents responsive to Plaintiff's requests until mid-September 2020.   However, documents produced to date evidence the following:

    a. The breaches of fiduciary duties by ATA's Board are much more pervasive, and have resulted in damages that are far greater, than first suspected and alleged;

8.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

b. The extent of the conflict of interest on the parts of members of ATA's management and their ties with Adelaida's management, are pervasive and have proliferated; and

c. The extent to which Adelaida, through Kedrin and her fellow managers at Adelaida, has taken advantage of and stolen from ATA is greater than first alleged.

18. In short, Plaintiff's Trusts have been oppressed, and the fiduciary duties owed to them by Defendants have been breached repeatedly. The law requires that directors, officers, controlling shareholders, and attorneys of corporations protect the interests of minority shareholders. Here, ATA's directors, officers, controlling shareholders, and attorneys have breached their fiduciary duties by acting in one of two ways: 1) they actively engaged in, facilitated, participated in, aided and abetted those breaches of fiduciary duty and wrongful conduct; or 2) they looked the other way when Kedrin, Elizabeth, and those ATA and Adelaida managers who were loyal to them imposed on ATA multiple unconscionable arrangements benefitting Adelaida at the expense of ATA. Defendants have acted clearly unreasonably under the circumstances described in this Complaint, which were known to them at all relevant times, and have wholly abdicated their corporate responsibilities.

19. On behalf of ATA, ATA Ranches, and his fellow minority shareholders, Plaintiff and his trusts seek monetary damages from the Director Defendants who breached their fiduciary duties and should now be held to account for the financial harm suffered by ATA, ATA Ranches, and their shareholders.

20. On behalf of ATA, ATA Ranches, and his fellow shareholders, Plaintiff and his trusts also seek damage from, and to impose a constructive trust on, assets of Kedrin and Adelaida acquired with the money and property of ATA that has been wrongfully diverted to Adelaida, or its shareholder KMBG, and

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

9.

THIRD AMENDED COMPLAINT

Kedrin.

21.   Plaintiff, individually and on behalf of Plaintiff's Trusts, also seeks direct damages that are unique to Plaintiff's Trusts and not incidental to the injuries to ATA and ATA Ranches.  Kedrin and Elizabeth, as controlling shareholders, owe fiduciary duties to Matthew's Trusts and Gretchen's Trusts as minority shareholders.  Kedrin and Elizabeth breached those duties by arranging for ATA to financially support Adelaida, a company in which Gretchen's Trusts own zero interest, and Matthew's Trusts only own a de minimis interest.  Through this arrangement, and with the informed aiding and abetting of Adelaida and certain Director Defendants, Kedrin and Elizabeth have paid themselves distributions and/or constructive distributions from ATA and prevented ATA from making distributions to its minority shareholders.

22.   For these reasons, discussed more fully herein, and for the further reason that Kedrin and a number of her fellow Director Defendants are recidivists,[1] Plaintiff seeks to enjoin the Director Defendants, Elizabeth, and Kedrin from continuing to manage ATA and ATA Ranches in the manner inconsistent with or in violation of their fiduciary duties.

## JURISDICTION AND VENUE

23.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between Plaintiff, on the one hand, and Defendants, on the other hand, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

24.   Venue is proper in this Court because each of the three corporations

---

[1] Plaintiff previously filed a lawsuit in 2009 against Kedrin and many of the Director Defendants for breach of their fiduciary duty and violation of the Texas Business Corporations Act for failing to provide corporate records, fraud, and negligent misrepresentation.  The prior litigation resulted in a settlement agreement between the parties.  Clearly, Kedrin and ATA's Board of Directors did not learn from this past litigation experience.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

10.

involved in this case conducts substantial business operations in the Central District of California. The corporate offices of two of these corporations are located in the Central District of California.

## THE PARTIES

25. Plaintiff is a citizen of the State of Nevada. Plaintiff is Trustee and beneficiary of The Matthew Van Steenwyk GST Trust and Trustee and beneficiary of The Matthew Van Steenwyk Issue Trust ("Matthew's Trusts"). Plaintiff, through Matthew's Trusts, is the owner of 23.75% of the Class B shares of ATA. Through Matthew's Trusts, Plaintiff has continuously owned ATA stock at all times relevant to the allegations of this Complaint, continues to be an ATA shareholder today, and intends to remain an ATA shareholder. Plaintiff, through Matthew's Trusts, owns a de minimis interest in KMBG of 0.16736%.

26. Plaintiff is also Co-Trustee of Gretchen's Trusts with respect to the shares of ATA Class B stock owned by Gretchen's Trusts. At all times relevant to the allegations in this Complaint, Gretchen's Trusts owned 23.75% of the Class B shares in ATA. Gretchen's Trusts collectively continue to be an ATA shareholder and intend to remain an ATA shareholder. Gretchen's Trusts do not own any interest in KMBG.

27. Nominal Defendant ATA is a corporation incorporated under the laws of the State of California and having its principal place of business in the State of California. ATA is a sister company of Scientific Drilling International, Inc. ("SDI"). ATA and SDI are engaged in the business of providing services and equipment to individuals and companies involved in oil and gas exploration. ATA has, historically, researched and developed tools and technologies for its own use and the use of SDI. ATA is named in this Complaint as a nominal defendant in its derivative capacity, and this shareholders' derivative action is brought on its behalf. ATA is headquartered and conducts substantial operations in the Central District

11.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

of California.

28.  Nominal Defendant ATA Ranches (a/k/a "ATAR") is a corporation incorporated under the laws of the State of Delaware.  On information and belief, ATA Ranches' principal place of business is in the State of California.  Until recently, Plaintiff was informed and believed that ATA Ranches came into existence in or about the Summer of 2018, without Plaintiff's knowledge.  However, Plaintiff recently discovered that ATA Ranches was operating as early as 2016.  ATA Ranches, the corporate entity formed in 2018, is a wholly-owned subsidiary of ATA.

29.  Defendant Adelaida is a corporation incorporated under the laws of the State of California.  KMBG purchased 100% of the stock of Adelaida in January 2013 for substantially less than its market value, raising serious tax implications.  As alleged in greater detail below, the stock purchase transaction resulted in ATA Ranches and Adelaida having different owners.  Adelaida's principal place of business is located in the Central District of California.

30.  Defendant Kedrin Van Steenwyk is a citizen of the State of South Carolina.  Plaintiff is informed, and on that basis alleges, that Kedrin is trustee of The Kedrin Van Steenwyk GST Trust and trustee and beneficiary of The Kedrin Van Steenwyk Issue Trust ("Kedrin's Trusts").  Kedrin, through her Trusts, is the owner of 23.75% of the Class B shares of ATA.  Kedrin controls both ATA and Adelaida by reason of the following:

a.  Kedrin holds a power of attorney over Elizabeth and controls Elizabeth's affairs under that power of attorney;

b.  As a Successor Trustee of the 1996 Trust, and as Elizabeth's attorney-in-fact, Kedrin controls the majority of all issued and outstanding Class A voting shares in ATA;

c.  Kedrin is a director of ATA;

12.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

d. Kedrin controls Adelaida through her control over its only shareholder, KMBG.  The 1996 Trust owns the substantial majority membership interest in KMBG;

e. In addition to her control over the 1996 Trust, Kedrin is currently entitled to receive a 51% majority interest in KMBG upon Elizabeth's death; and

f. Kedrin is the chief executive officer and a director of Adelaida.

31.    Kedrin receives compensation from ATA for her service as an ATA director and from Adelaida for her service as an officer and managing agent.

32.    Defendant Pamela Pierce ("Defendant Pierce") is a citizen of the State of Texas.  Defendant Pierce is the Lead Director of ATA's Board of Directors, and beginning May 15, 2020, serves as Interim Chief Executive Officer ("CEO").  Defendant Pierce receives compensation from ATA for her service as an ATA Board of Director.  Because it has not been disclosed to Plaintiff, Plaintiff does not currently know Defendant Pierce's relationship to ATA Ranches.

33.    Defendant Phillip Gobe ("Defendant Gobe") is a citizen of the State of Texas.  Defendant Gobe was a director on the ATA board of directors during the timeframes relevant to this Complaint.  Defendant Gobe receives compensation from ATA for his service on ATA's Board of Directors.  Because it has not been disclosed to Plaintiff, Plaintiff does not currently know Defendant Gobe's relationship to ATA Ranches.

34.    Defendant Phillip Longorio ("Defendant Longorio") is a citizen of the State of Texas.  As of May 15, 2020, Defendant Longorio is the former CEO and President of ATA, as well as a former director.  Defendant Longorio received compensation from ATA for his service as ATA's CEO and President and his service on its board of directors.  Plaintiff is informed and believes, and on that basis alleges, that Defendant Longorio was the CEO of ATA Ranches at relevant

13.

times.

35.   Defendant Gene Durocher ("Defendant Durocher") is a citizen of the State of Texas.  Defendant Durocher is a member of the ATA Board of Directors. Defendant Durocher is compensated by ATA for his service on ATA's Board of Directors.  Because it has not been disclosed to Plaintiff, Plaintiff does not currently know Defendant Durocher's relationship to ATA Ranches.

36.   Defendant Daniel Carter ("Defendant Carter") is a citizen of the State of Texas.  Defendant Carter wears many hats:

> a.  At all times relevant, Defendant Carter served as Secretary and General Counsel for ATA, for which he receives compensation from ATA;
>
> b.  At all times relevant, Defendant Carter served as a director on ATA Ranches' Board of Directors; and
>
> c.  Since in or about August 2016, Defendant Carter has served as a director and officer for Adelaida.

37.   Defendant Joseph McCoy ("Defendant McCoy") is a citizen of the State of Texas.  Defendant McCoy is a director on the ATA Board of Directors. Defendant McCoy receives compensation from ATA for his service on ATA's Board of Directors.  Because it has not been disclosed to Plaintiff, Plaintiff does not currently know Defendant McCoy's relationship to ATA Ranches.

38.   Defendant Elizabeth Van Steenwyk is a citizen of California. Elizabeth is the original trustee of the Survivor's Trust of the 1996 Trust.  Elizabeth, through the 1996 Trust and other trusts, is the owner of all issued and outstanding Class A voting shares in ATA.  In addition, Elizabeth is the beneficial owner of a controlling interest in KMBG.  As alleged above, KMBG is the sole shareholder of Adelaida.  Even though Elizabeth was declared non compos mentis and admitted to a memory care facility in 2016, the ATA Board has continued to authorize

14.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   payment to Elizabeth for her service on the Board.

2   39.   Except as described herein, Plaintiff is ignorant of the true names of

3   Defendants sued as Does 2 through 10, inclusive, and, therefore, Plaintiff sues these

4   Defendants by such fictitious names.   Following further investigation and

5   discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege

6   their true names and capacities when ascertained.   These fictitiously named

7   Defendants are the Company's officers, other members of management, employees

8   and/or consultants who were involved in the wrongdoing detailed herein.   On

9   information and belief, each of these Defendants are citizens of states diverse from

10   that of Plaintiff.   These Defendants aided and abetted and/or conspired with the

11   named Defendants in the wrongful acts and course of conduct or otherwise caused

12   the damages and injuries claimed herein and are responsible in some manner for

13   the acts, occurrences and events alleged in this Complaint.

14   40.   At all relevant times, each of the Defendants was the agent of the

15   remaining Defendants, and in doing the acts alleged herein, were acting within the

16   course of scope of such agency.   Each Defendant ratified and/or authorized the

17   wrongful acts of each of the other Defendants.   Finally, Defendants, each of them,

18   is individually sued as a participant and as an aider and abettor in the improper acts,

19   plans, schemes, and transactions that are the subject of this Complaint.

20   41.   In committing the wrongful acts alleged herein, each of the

21   Defendants has acted in concert and as part of an enterprise with each of the other

22   Defendants, and has pursued, or joined in the pursuit of, a common course of

23   conduct, and has acted in concert with and conspired with each of the other

24   Defendants in furtherance of their common plan or design.   In addition to the

25   wrongful conduct herein alleged which gives rise to their primary liability, the

26   Director Defendants are liable for aiding and abetting and/or assisting the other

27   Defendants in breaching their respective duties.

15.

THIRD AMENDED COMPLAINT

Spertus, Landes & Unhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

42.   Plaintiff is informed and believes, and on that basis alleges, that an association-in-fact existed between the Director Defendants, Kedrin, and Adelaida (and Elizabeth prior to June 2016), that this association-in-fact was engaged in an enterprise that affected interstate commerce, and that the participants in the enterprise utilized the mails and wire communications in engaging in the tortious and unlawful conduct alleged in this Complaint.

## STATEMENT OF FACTS

**A.     ATA's Shareholders and Shareholder Structure**

43.   ATA issued two classes of shares to its shareholders – Class A voting shares and Class B capital shares.  Class A shares have voting rights.  Class B shares do not have voting rights.

44.   Elizabeth, through the 1996 Trust, owns 50,000 Class A shares, the only voting shares issued by ATA.  Accordingly, the 1996 Trust possesses all voting rights in ATA and controls who serves on its board.

45.   The holders of Class B shares in ATA are Kedrin through Kedrin's Trusts, Matthew's Trusts, Gretchen's Trusts, and Brett Van Steenwyk through his GST and Issue Trusts ("Brett's Trusts").

46.   Plaintiff, through Matthew's Trusts, owns 237,500 shares of Class B stock in ATA, representing close to a 24% equity ownership in ATA, with no voting rights.

47.   Gretchen Marie Van Steenwyk-Marsh, through Gretchen's Trusts, owns 237,500 shares of Class B stock in ATA, representing close to a 24% equity ownership interest in ATA, with no voting rights.

**B.     Separation of Ownership of ATA and Adelaida**

48.   Prior to the 2013 Sale, ATA owned all outstanding stock in Adelaida. Through the 2013 Sale, ATA sold all of its stock in Adelaida to KMBG.  The details and terms of the sale were not shared by the Director Defendants with Plaintiff at

16.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

the time of the sale.  Plaintiff did not discover the one-sided and unconscionable terms of the 2013 Sale, as well as the facts discussed below, until recently in this case when the Director Defendants belatedly produced documents in response to Plaintiff's discovery requests.

49.  Discussion regarding ATA's sale of its Adelaida stock and exchange of properties with KMBG was initiated by the general manager of Adelaida (believed to have been an employee on ATA's payroll).  The general manager made a request for $10,000,000, which consisted of money for a new winery facility ($6,000,000), upgraded production equipment ($2,000,000) and vineyard development ($2,000,000).

50.  The stock sale transaction involved ATA's sale of its stock in Adelaida to KMBG for $3,100,000.  This amount was significantly less than market value.  Essentially, it amounted to ATA's adjusted tax basis.  However, at a presentation to ATA's Board, Elizabeth, Kedrin, and others acting in concert with them, characterized the purchase price as being fair market value.  This representation was false.

51.  The transaction was structured as an installment sale.  No cash down payment was made by KMBG.  The entire purchase price was in the form of a promissory note from KMBG to ATA, which was to be repaid in installments (the "2013 Promissory Note").  The unpaid principal bore an interest rate of less than 1% per annum; significant because, as described below, KMBG represented a tremendously risky investment.  No appraisal of Adelaida's stock was completed.

52.  In addition to selling Adelaida to KMBG for less than market value, ATA also agreed to assume $2,000,000 in vineyard development costs by retaining ownership of the vineyard properties, HMR Ranch and Viking Ranch.

53.  The consideration for the 2013 Sale was so one-sided as to render the agreement unconscionable.  Further, the consideration promised by KMBG,

17.

THIRD AMENDED COMPLAINT

controlled by Elizabeth and later Kedrin, was illusory based on the fact that KMBG did not have the financial wherewithal to make the periodic note payments called for under the 2013 Promissory Note.  The 2013 Promissory Note simply gave the appearance of legitimacy for what was essentially a gift to KMBG, and a constructive dividend to Kedrin and Elizabeth.

54.    As part of the one-sided stock purchase agreement, ATA also promised to enter into an Agreement for Services, a copy of which was attached to the stock purchase agreement.  Under this one-sided agreement, ATA agreed to provide KMBG and Adelaida with wide-ranging services for a small fraction of their value.  In its implementation, the Agreement for Services damaged ATA and its minority shareholders, Matthew's Trusts and Gretchen's Trusts, who possess little or no interest in KMBG.  The 2013 Sale of Adelaida to KMBG marks the beginning of a practice by Elizabeth and Kedrin, both controlling shareholders of ATA, to pay themselves actual and/or constructive dividends in the form of forcing ATA to subsidize KMBG, an entity owned and controlled by Elizabeth and Kedrin, in its ownership and operation of Adelaida.  In addition to the employment, technical, and professional services ATA provided under the Agreement for Services, the subsidies included: selling ATA's premium wine grapes to Adelaida at a fraction of their market value; paying for ATA personnel to run Adelaida's operations; paying Adelaida's operating costs; advancing or loaning Adelaida money at zero or below market interest; paying for and/or advancing costs of capital expenditures; and bearing the costs to operate the HMR and Viking Ranches at substantial losses.  Those subsidies and others caused harm to ATA and prevented ATA from paying dividends to its minority shareholders.

55.    From 2013 to 2016, Elizabeth, Kedrin, and other members of ATA's management forced ATA to sell all of the wine grapes grown on the HMR Ranch and Viking Ranch to Adelaida for a fraction of the market value of those premium

18.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

wine grapes.  During the 2013 to 2016 time frame, this arrangement by which ATA took enormous losses providing fruit to Adelaida for less than the market rate, was not the subject of a written agreement, but was the product of fiduciary duty breaches by Elizabeth, Kedrin, and/or other members of ATA management, working in concert with Adelaida's management.

**C.**   **Kedrin's Control of ATA Since 2016 Through Obtaining Control Over Elizabeth's Class A Shares**

56.   Until June of 2016, Elizabeth was the Trustee of the 1996 Trust, and as a result, owned all Class A voting shares in ATA and also a majority ownership interest in Adelaida through KMBG.

57.   Based upon her medical records, Elizabeth began "to develop the rapid onset of . . . severe cognitive problems" in mid-March of 2016.

58.   Plaintiff is informed and believes, and on that basis alleges, that the foregoing history of the "rapid onset of severe cognitive problems" was communicated to Elizabeth's examining doctor by Kedrin, who is also a medical doctor and who accompanied Elizabeth to the medical examination.  In this same timeframe, Elizabeth was prescribed a drug called Namenda, which is used to treat Alzheimer's.  Plaintiff is informed and believes that Kedrin knew her mother was taking Namenda.  In fact, Kedrin administered Namenda to Elizabeth.

59.   Notwithstanding Kedrin's awareness of her mother Elizabeth's cognitive problems, in mid-March 2016, Elizabeth was allowed to execute a challenged Agreement for Services in this matter, on behalf of Adelaida on or about April 1, 2016 (a true and correct copy is attached hereto as **Exhibit 1**).  Like the 2013 Agreement for Services that preceded it, in the 2016 Agreement for Services, ATA was forced to provide substantial services to Adelaida for significantly less

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

19.

THIRD AMENDED COMPLAINT

than the value of those services.[2]

60.    The very next month, in May 2016, two doctors wrote reports concluding, respectively, that: (1) Elizabeth's reported "problems currently deprive her of [ ] capacity"; and (2) Elizabeth is "no longer able to adequately monitor and control her finances . . . ."

61.    Plaintiff is informed and believes, and on that basis alleges, that Kedrin played an instrumental role in obtaining the two medical reports.  Based on the conclusions expressed in the reports, Kedrin was appointed as the Successor Trustee under the 1996 Trust and as Elizabeth's attorney-in-fact, and took over control of all Class A (voting) shares in ATA, becoming its majority shareholder. Kedrin also assumed control over a substantial majority membership interest in KMBG and Adelaida, and became Adelaida's CEO.  Meanwhile, Elizabeth was admitted into a memory care facility.

62.    Plaintiff is informed and believes, and on that basis alleges, that the foregoing timetable and stated facts support two alternative theories relevant to the allegations herein regarding Elizabeth's competence:

    a.   Elizabeth possessed capacity in April 2016 when she executed the 2016 Agreement for Services, and the conclusions reached by her two examining doctors in May 2016 are flawed because they are based on flawed histories.  Accordingly, the transactions by which Kedrin assumed control over the 1996 Trust, Elizabeth, ATA, and Adelaida should be examined and set aside; or

    b.   Elizabeth lacked capacity in April 2016, when she signed the Agreement for Services and was merely being used by Kedrin to

---

    [2] Since the April 1, 2016 Agreement for Services was signed, ATA and Adelaida entered into another Agreement for Services dated July 1, 2017.  ATA and Plaintiff experienced damages stemming from each of the Agreements for Services.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

effectuate the 2016 Agreement for Services until Kedrin could formally assume control over the 1996 Trust, KMBG and ATA.

**D. Kedrin's Control of Adelaida Through Her Control Over Elizabeth's Interest in KMBG**

63.    Kedrin obtained control over Adelaida by the same two transactions pursuant to which she obtained control over ATA.  As a result of those transactions she became Adelaida's CEO in 2016.

64.    Kedrin directed, authorized, and/or ratified transactions benefitting herself and/or her interest in Adelaida, through its shareholder KMBG, at the expense and to the substantial detriment of ATA, ATA Ranches, and their minority shareholders.

**E. Kedrin's Breach of Fiduciary Duties as Director to ATA in Connection With Elizabeth's Transactions**

65.    Kedrin exercised undue influence over Elizabeth by reason of Kedrin's filial relationship with Elizabeth, Kedrin's status as a medical doctor, and Kedrin's knowledge of Elizabeth's mental vulnerability.  Specifically, Kedrin unduly influenced Elizabeth in the two transactions by which Kedrin obtained control over ATA, KMBG, Adelaida, and also in inducing Elizabeth to execute the 2016 Agreement for Services.

66.    Through her actions, Kedrin has exposed ATA to potential civil claims for financial elder abuse and Elizabeth to claims of breach of fiduciary duty.

**F. Defendants' Breach of Fiduciary Duties In Allowing ATA Goods and Services to be Taken By Adelaida In and After 2016**

67.    Kedrin used her powers as director of ATA, as well as the powers she obtained under the power of attorney over Elizabeth and as successor trustee of the 1996 Trust, which gave her power over *all Class A voting shares* in ATA, to engage in acts of self-dealing at the expense and to the detriment of ATA, ATA Ranches,

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

21.

and their minority shareholders, including Plaintiff's Trusts.  Moreover, because Kedrin is an owner of and controls both ATA and KMBG, each transaction she arranges and/or directs wherein ATA is forced to subsidize and financially support Adelaida amounts to the transfer of value from one company she controls (ATA) to another company she also controls and will someday own outright (KMBG/Adelaida).  In contrast, Plaintiff's Trusts suffer all of the economic pain and enjoy none of the economic gain from those transactions.

68.     Kedrin directed and/or authorized, and the Director Defendants approved and/or ratified, the transactions between ATA and Adelaida described in this Complaint.  Those transactions benefitted Adelaida and Kedrin, and damaged ATA, ATA Ranches, and their minority shareholders, including Plaintiff's Trusts.

69.     Continuing a tradition started by Elizabeth at around the time of the non-arm's length sale of Adelaida to KMBG in 2013, ATA entered into an Agreements for Services with Adelaida in 2016.  Pursuant to the Agreements for Services, ATA has paid for, covered, and/or subsidized Adelaida's business overhead and operating expenses.  Plaintiff is informed and believes and, on that basis, alleges that the services ATA has provided to Adelaida under the Agreement for Services were worth far more than the flat monthly fees called for in each of them.  For example, the services ATA provided to Adelaida under the 2016 Agreement for Services include preparation of Adelaida's monthly financial statements and income tax returns, legal consultations, human resource inspections and training, construction and maintenance support, repairs of technology and computer IT support, and other services that have yet to be identified.  A similar Agreement for Services was entered into on July 1, 2017, but further reduced the already miniscule compensation paid to ATA.

70.     ATA management entered into a Grape Purchase Agreement in or about December 2016 pursuant to which ATA is obligated to sell wine grapes

22.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

grown on ATA's property, to Adelaida for substantially less than their market value.  Kedrin executed the Grape Purchase Agreement on behalf of Adelaida, a true and correct copy of which is attached hereto as **Exhibit 2**.  Adelaida pays less than fair market value for the grapes it purchases under the Grape Purchase Agreement.  Adelaida then resells some of those same grapes to third parties for more than twice the amount that Adelaida pays ATA for the grapes.  For example, Adelaida was paid by one of its customers (Opolo Wines LP) $2,750 per ton for zinfandel grapes based on Adelaida's 2018 Summary of Grape Sales, but Adelaida paid ATA only $1,299 per ton for the zinfandel grapes based on ATA's summary of grape invoices it recently produced to Plaintiff.

71.    As alleged above, ATA has, since 2013, continued to pay all of the costs of owning and operating the two wine grape properties, HMR Ranch and Viking Ranch, incurring significant losses in the process of subsidizing Adelaida and its owners.  Plaintiff is informed and believes and, on that basis, alleges that ATA is also paying for the operating expenses of the Par and Hilltop Ranches, ranches owned by KMBG, the sole shareholder of Adelaida.  Plaintiff has repeatedly requested documents evidencing ATA's activities relating to these operating expenses but, as of the date of this Complaint, Defendants have failed to provide the requested information.

G.    **Kedrin's Solidification of Her Control Over Both ATA and Adelaida**

72.    In August 2016, Kedrin presided over a Financial Summit wherein the financial statements and future plans of ATA, ATA Ranches, Adelaida, and Stoneway Properties, an entity whose role and identity have been hidden by the Director Defendants, were discussed.  The summit was attended by officers and management employees of ATA, members of Adelaida's management, and people like Defendant Carter, who served as an officer and/or director of both Adelaida and ATA.  One of the attendees at the 2016 Financial Summit was Kedrin's

23.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

stepson, Kieran Duggan, who had been installed on Adelaida's Board of Directors and who is currently the Corporate Accounting Director for ATA. In July 2020, Kieran was also appointed as the Treasurer and Assistant Secretary of ATA.

73. At the August 2016 Financial Summit, Defendant Carter was voted onto the Adelaida Board of Directors. Plaintiff is informed and believes that Defendant Carter prepared and/or approved the November 2016 Grape Purchase Agreement as ATA's General Counsel on behalf of ATA while also serving on Adelaida's Board.

74. Kedrin and Defendant Carter, both of them officers and/or directors of both ATA and Adelaida, then executed a new Agreement for Services in 2017. This document was only recently produced by Defendants through discovery, notwithstanding the fact that it was requested before this lawsuit was filed. The 2017 Agreement for Services is substantially similar to the 2016 Agreement for Services, but only obligates Adelaida to pay $1,500 per month for the wide range of employment, technical, and professional services described thereon.

75. As detailed below, Defendant Carter and outside legal counsel for ATA, Sabrina McTopy, continued to support and facilitate Kedrin's fiduciary duty breaches and oppression of ATA's minority shareholders.

**H.    Kedrin's Breach of Fiduciary Duties by Treating ATA's and ATA Ranches' Properties as Her Own**

76. ATA sustained significant financial losses as a result of ATA's poorly performing ranching operations. The losses incurred by ATA's ranching/wine grape operations resulted in a corresponding benefit to Kedrin and/or Adelaida. Financial statements show that ATA lost $1,145,441 in 2016, $1,315,451 in 2017, and $1,367,571 in 2018 in the ranching and grape growing operations. In fact, company financials show that the ranching operations have never been a viable operation on their own. These loss figures do not include all of the expenses ATA

24.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

was directed to incur and did incur for the benefit of Adelaida.

77.    Kedrin, through her power over ATA, treats the real property assets of ATA as her own.  In 2018, Kedrin made proposals to Plaintiff and other shareholders of ATA in which she offered to purchase ATA's ranch/wine grape properties, HMR Ranch and Viking Ranch at a discount.  That transaction ultimately did not close.  However, representations made by Kedrin and her representatives during the negotiation and threats Kedrin made to Plaintiff at the end of the negotiation, caused Plaintiff to conduct the investigation that led to his requests for corporate records and demand for corrective action.

78.    Before Kedrin's attempt to purchase the ranches at a discount in 2018, Plaintiff was unaware of the details of the transactions described in this Complaint in which ATA was made to financially support Adelaida.  Before Kedrin's attempted purchase of the ranches, and before he began conducting the investigation still ongoing in this action, Plaintiff did not know and had not been informed by any of the Defendants who owed fiduciary duties to him:

> a. Of the unfair terms of the 2013 Sale;
>
> b. That ATA was obligated to sell grapes to Adelaida at below market rates;
>
> c. That ATA was obligated to provide valuable services to Adelaida for a nominal monthly fee;
>
> d. That ATA's leaders, including Defendant Carter and Dana Armstrong, allowed ATA to subsidize Adelaida's costs of doing business by paying for and/or loaning money to Adelaida or KMBG for below market interests rates.

79.    ATA Ranches was also created without Plaintiff's knowledge.  The ranches owned by ATA to support Adelaida were transferred to ATA Ranches for no consideration.  Plaintiff is informed and believes that these two transactions

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

25.

were related to Kedrin's attempt to transfer ATA's ranches to herself. Kedrin, with the assistance of Defendant Carter and the approval of the Director Defendants, authorized the payment of substantial legal fees by ATA in analyzing the tax and legal consequences of Kedrin's purchase of ATA's ranch properties and/or the transfer of the properties to a subsidiary to benefit Kedrin and Adelaida.

## I.   Opinions of Corporate Officers re Problems Associated with ATA's Ownership of Ranches and Relationship Between ATA and Adelaida

80.   Shortly after the 2013 Sale, a corporate officer advised Elizabeth and Kedrin that transactions between ATA and Adelaida had to be at arm's-length, and ATA's minority shareholders needed to be treated fairly.

81.   Later, a corporate officer complained that the ranches were unnecessarily causing ATA to lose a lot of money and should be sold.

82.   In 2018, ATA's Vice President of Tax, expressed the opinion that the structure of the relationship between ATA and Adelaida would likely not withstand IRS scrutiny and that the wine grape ranches, which he characterized as "ATC Ranches", should be sold. He stated:

> "After the spin-off, however, ATC Ranch losses can be utilized only against Ranch profits in a later year. We could end up in a similar situation as with Adelaida Cellars: on-going tax losses that cannot be utilized are locked into a separate legal entity; as a result, the losses cannot be utilized until after the Ranches become profitable. Furthermore, under the post-spin structure, Ranch operating losses will be subject to the so-called Hobby Loss Rules and higher levels of IRS scrutiny. As a separate stand-alone corporation, the IRS will probably audit ATC [sic] Ranches separately from its audit of ATA and SDI. Issues, such as transfer pricing for the grape sales to Adelaida or whether the expenditures at ATC Ranches should be charged to KMBG or Adelaida, may be subject to additional IRS scrutiny, these issues have not been examined closely under the current structure."

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

26.

83.     As evidence of the collusion between Kedrin, Elizabeth, and the Director Defendants, the opinions of ATA's own Vice President of Tax went unheeded.   The ranches were not sold.   Rather, they were transferred to ATA Ranches.

**J.      Acts and Omissions of ATA's Board and Attorneys in Allowing Kedrin to Treat HMR Ranch and Viking Ranch As Her Own**

84.     During negotiations between Kedrin and her siblings about the potential sale of ATA's HMR Ranch and Viking Ranch to her, Kedrin proposed a sales price good for her, and bad for ATA and the minority shareholders.

85.     Kedrin, ATA's General Counsel and Secretary (Defendant Carter) and ATA's outside counsel (Sabrina McTopy) all knew that the appraisals for the ranch properties on which the purchase price was based were flawed.

86.     Specifically, the appraiser failed to include $1,000,000 of assets of the ranch properties.   Neither general counsel nor outside counsel, both of whom owed duties to ATA and its minority shareholders, contacted the appraiser to advise it of the erroneous admission and request that the mistake be corrected and the appraisal updated.   Attorney McTopy stated in her March 2019 email to Kedrin, Defendant Carter, and others:

> "5.     ATA's Contribution Agreement by which it contributed the ranches and other assets listed on Schedule A effective November 30, 2018 (note the balance sheet balances of those items are included on Schedule A, likely to establish the ATAR beginning balance sheet, although those depreciated book values bear no relationship to the Cushman Wakefield appraised value, and also note that almost $1mm book value of machinery and equipment does not appear to be included in the CW appraised value);

87.     After Kedrin's attempt to purchase the ranches fell through, in 2018 ATA's outside counsel and its general counsel formed a new Delaware corporation,

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

27.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ATA Ranches.  Once ATA Ranches was formed, ATA transferred the HMR Ranch and Viking Ranch to ATA Ranches for no consideration.  In fact, ATA transferred an initial $2,000,000 to ATA Ranches in addition to the real properties.  Documents only recently produced in discovery further demonstrate that additional capital infusions have been made to ATA Ranches, but not properly accounted for.

88.    Plaintiff is informed and believes that ATA Ranches is currently incurring all of the expenses associated with growing, harvesting, and transporting wine grapes on the HMR Ranch and Viking Ranch to Adelaida for a price that is a small fraction of the market value of those grapes.

89.    Plaintiff is further informed and believes that the payments from Adelaida go to Stoneway, an entity whose existence, ownership, and role has been, and continues to be, hidden from Plaintiff.  Plaintiff is informed and believes that despite contrary representations to Plaintiff, Director Defendants, the controlling shareholders, and Adelaida use Stoneway for purposes related to both ATA and KMBG.  The ways in which Stoneway is utilized by ATA and Adelaida has yet to be discovered by reason of Defendants' continued failure to produce requested documents.

90.    The financial statements of Stoneway were summarized and the subject of discussions at the August 2016 Financial Summit attended by officers and directors of both ATA and Adelaida, described in paragraphs 72 through 75 above.  These financial statements have been requested, but have not been produced to Plaintiff in this case to date.

**K.    Defendants' Breach of Fiduciary Duties In Its Lending Practices With Companies Controlled By Kedrin**

91.    ATA loaned money to Adelaida and KMBG to fund their operating costs.  Plaintiff is informed and believes and, on that basis, alleges that Adelaida, KMBG and their affiliates have borrowed millions of dollars.  Plaintiff has

28.

requested that ATA's Board of Directors provide documents evidencing the financing terms, interest, and/or other fees Adelaida, KMBG, and their affiliates have paid to ATA for the borrowed money but, as of the date of the filing of this Complaint, the Director Defendants have refused to provide the requested information.  Plaintiff is informed and believes that the loan transactions were not "arm's length" transactions.

92.    Plaintiff has also requested that the Director Defendants provide documents evidencing the balances outstanding on the loans and advances ATA has made to Adelaida, KMBG, and their affiliates, as well as the repayment history of those claims.  Director Defendants have yet to produce the requested documents to Plaintiff.

93.    Despite the zero amount listed for notes receivable in 2016 and 2017 financial statements, according to a disclosure certificate dated June 30, 2016, and signed by ATA's Senior Vice President and Chief Financial Officer Dana Armstrong, ATA, "in its ordinary course of business, advances funds to KMBG, LLC and Adelaida Cellars . . . to fund such entities to pay their respective operating costs."  The disclosure certificate goes on to state that the following amounts were owed to ATA as of April 30, 2016: $552,141.19 by KMBG, and $2,139,838.68 by Adelaida.

94.    Financial statements for ATA indicate a "notes receivable – ACI," relating to debt owed by Adelaida to ATA.  As of 2014, the amount owed was $3,845,896.  At the time of the 2016 Financial Summit, financial statements also show that the mysterious entity, Stoneway, owed ATA $7,182,919 (further undermining representations to Plaintiff that Stoneway is a dba of ATA).

95.    The Director Defendants have failed to account for ATA's "notes receivable - ACI" relating to debt owed by Adelaida from ATA's financial statements.  Plaintiff is informed and believes and, on that basis, alleges that the

29.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

"notes receivable – ACI" related to ATA's funding of Adelaida's winery operation and KMBG's payroll, among other things.  The "notes receivable – ACI" was eliminated from ATA's balance sheets without adequate explanation, after Plaintiff brought up the subject to Defendant Longorio.  Plaintiff specifically requested that Director Defendants explain and produce documents relating to the "notes receivable – ACI."  However, Director Defendants refused to provide the requested explanation and/or information.

96.     Despite its obligations under the 2013 Promissory Note, Adelaida's owner KMBG defaulted on the note and failed to make required payments.  The Director Defendants took no action to enforce the note.  Rather, they allowed ATA to continue acting as KMBG's/Adelaida's bank, carrying KMBG's repayment obligation with no interest, essentially paying dividends to Kedrin, Elizabeth, and entities in which they hold significant interests, and denying distributions and dividends to the trusts Plaintiff represents.

## L.     Breaches of Fiduciary Duties By Omissions and Failures to Act

97.     Notwithstanding the significant losses ATA sustained in its non-core business of owning and operating the HMR Ranch and Viking Ranch, and notwithstanding multiple admissions by members of ATA's management that the non-core assets should be sold, the Director Defendants have made no effort to market and sell the wine grape properties.

98.     Bowing to Kedrin's and Elizabeth's pressures, the Director Defendants have allowed ATA's money, services, and property to be diverted to Adelaida, and failed to sell the money-losing ranch properties.  Simultaneously, the Director Defendants have failed to devote their time and attention, and ATA's resources, to projects critical to the success of ATA's and SDI's core businesses.  One such project involved ATA's R&D project developing a tool known as the "Halo" tool.  ATA's Board scaled back and ultimately slowed down the Halo

30.

project for the purported reason that the oil market was in a down-turn.  Plaintiff is informed and believes and on that basis alleges that SDI and ATA had the necessary cash reserves to continue with the "Halo" tool R&D project at the time it was scaled back and/or slowed down.  However, at the same time, the Director Defendants authorized and/or allowed the diversion of scarce ATA resources to Adelaida as detailed above.  As a result of the Director Defendants' decision to slow down the "Halo" tool R&D project, ATA was harmed in two material ways: (1) because the tool was a late entrant to the market, ATA lost potential market share and sales; and (2) because the "Halo" tool was not completed, tested and ready for market as quickly as it otherwise could have been, the projected revenues on which a potential sale of SDI and ATA was based were not met and the potential sale was delayed and, ultimately, fell through.  The decision negatively impacted the proposed sale of ATA and its affiliated corporation in 2018 resulting in a substantial financial loss to ATA's shareholders.

99.    During an ATA shareholder meeting on August 1, 2019, Defendant Longorio stated that ATA's financial situation was tough going and that ATA needed all the financial resources it could muster to keep it afloat financially.  ATA's recent layoffs underscore this reality, as does the fact that ATA has failed to make profit distributions to its Class B shareholders, including Plaintiff's Trusts.  Notwithstanding this reality, the Director Defendants have engaged in, authorized, and/or ratified the acts and omissions detailed above and directed or allowed ATA to subsidize Adelaida and its owners in breach of their fiduciary duties to ATA and its shareholders.

100.   As a result of the transactions detailed above, and others that have not yet been ascertained, it is alleged that Kedrin and her fellow Director Defendants have caused ATA, ATA Ranches, and their shareholders damages.   The shareholder damages are particular to Plaintiff and the trusts he represents due to

31.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1  the fact that Elizabeth and Kedrin, with the assistance of the Director Defendants

2  and Adelaida, are taking assets from ATA and giving them to Adelaida and its

3  owners.  Defendants are aware of and have knowledge of the fact that the Plaintiff's

4  Trusts are ATA shareholders, but *not* Adelaida shareholders.  Elizabeth and Kedrin

5  have bestowed unjust benefits on themselves and Adelaida.

6  **M.     Additional Breaches of Fiduciary Duties By Director Defendants Other**

7  **Than Kedrin**

8      101.   The Director Defendants, other than Kedrin, breached and are

9  breaching their individual and collective fiduciary duties to ATA, ATA Ranches,

10  and their shareholders in one or more of the following ways: (1) they have

11  authorized the challenged conduct and transactions detailed above without

12  examining them objectively and thoroughly; (2) they have authorized the

13  challenged conduct and transactions detailed above with full knowledge and

14  appreciation that the conduct and transactions have benefitted Adelaida and Kedrin,

15  at the expense of ATA, ATA Ranches, and their shareholders; (3) they have failed

16  to investigate and/or take action on the challenged conduct and transactions after

17  Plaintiff and his counsel made the Director Defendants aware of that conduct and

18  those transactions; and (4) they have ratified the challenged conduct and

19  transactions by their inaction, with knowledge, after the fact.

20      102.   As a result of their actions, and/or their continuing inaction, and their

21  resulting breaches of their fiduciary duties owed to ATA and its shareholders, the

22  Director Defendants have caused and are causing ATA, ATA Ranches, and their

23  shareholders damages.

24      103.   As a further result of their actions and inactions, which continue, and

25  resulting breaches of their fiduciary duties, the Director Defendants bestowed and

26  are bestowing unjust benefits on Adelaida, Kedrin and/or Elizabeth, and at the

27  expense of ATA, ATA Ranches, and their shareholders.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

THIRD AMENDED COMPLAINT

**N.      Adelaida's and Director Defendants' Aiding and Abetting the Majority Class A Shareholders' Breaches of Fiduciary Duties to Class B Shareholders**

104.    A 2016 Financial Summit was held at Adelaida's place of business in Paso Robles, California in August 2016.

105.    The Financial Summit was attended by officers and employees of ATA, including ATA's Corporate Secretary and General Counsel Carter, ATA's Chief Financial Officer Dana Armstrong ("CFO Armstrong") and employee Kieran Duggan ("Kieran"), Kedrin's stepson.  Plaintiff is informed and believes that CFO Armstrong and Kieran prepared summaries of financial statements of ATA, ATA Ranches, KMBG, and Stoneway that were disseminated and discussed at the Financial Summit.

106.    The Financial Summit was also attended by members of Adelaida's management.  In addition, Plaintiff is informed and believes that ATA's Corporate Secretary and General Counsel, Defendant Carter, was made a director of Adelaida at or during the Financial Summit.  As a result, Adelaida's management and Board of Directors was represented at the Financial Summit.

107.    At the Financial Summit, the attendees agreed to consummate and/or continue certain financial transactions, the goals of which were to decrease Adelaida's business expenses and costs of doing business and, thereby, increase the bottom line profitability of Adelaida, a company that had never made a profit under Kedrin's or Elizabeth's tenures as CEO.  Those transactions included:

    a.  Agreeing that ATA would continue its ownership of HMR and Viking Ranches, and continue to pay all expenses of owning and operating the ranches (a practice that continued since the 2013 Sale of Adelaida to KMBG);

    b.  Entering into an agreement by which ATA would be required to sell

33.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

all of the premium wine grapes grown on the HMR and Viking Ranches to Adelaida at a steep discount from their market value (a formalization of an unwritten arrangement in place since the 2013 Sale);

c.  Allowing Adelaida to resell the wine grapes purchased at a steep discount from ATA that were not used by Adelaida to make its wine on the open market for their market value;

d.  Requiring ATA to continue to provide Adelaida with a wide range of employee and professional services at considerably less than the market value of those services (a practice formally in place since the 2013 Sale and implemented through the Agreement for Services);

e.  Formalizing the practice of ATA loaning, advancing, and/or giving money to Adelaida and/or its affiliates for no interest and/or below market rates of interest; and

f.  Requiring ATA to subsidize the Adelaida wine operation in other ways.

108.  A specific game plan was devised and agreed upon for continuing and/or implementing the transactions detailed in the preceding paragraph.  That plan and its implementation were known to Adelaida, through the knowledge of its director (Defendant Carter) and its management members who attended the Financial Summit.  That plan and its implementation also became known to Adelaida through the knowledge of its CEO (Kedrin), and its later director (Kieran).

109.  The Director Defendants of ATA also had actual knowledge of the transactions designed to benefit Adelaida at the expense of ATA and ATA's minority shareholders (including Plaintiff and Plaintiff's Trusts).  Plaintiff is informed and believes that the Director Defendants had knowledge of these

34.

1 transactions through the knowledge of the controlling shareholders (Kedrin and
2 Elizabeth), ATA's Corporate Secretary and General Counsel (Defendant Carter),
3 ATA's Chief Financial Officer (CFO Armstrong), and ATA employee Kieran.
4 Plaintiff is informed and believes that the Director Defendants also had actual
5 knowledge of the transactions through ATA's former CEO Defendant Longorio, a
6 signatory on the Grape Purchase Agreement signed on December 15, 2016.

7       110.   Plaintiff is informed and believes and on that basis alleges that
8 Defendant Carter – while serving simultaneously as both a director of Adelaida and
9 an officer and attorney for ATA – prepared the contracts between Adelaida and
10 ATA regarding wine grapes and services, and signed one of them.  Plaintiff is
11 further informed and believes that Kieran tracked and managed the enormous cash
12 advances and loans from ATA to Adelaida and/or its affiliates from the time of the
13 Financial Summit through the period of time after he was made a director of
14 Adelaida to the present.

15      111.   The conduct on the parts of Adelaida (through its officers and
16 directors and with their knowledge), and Director Defendants constitute tortious
17 aiding and abetting of the breaches by the controlling shareholders of ATA of their
18 fiduciary duties owed to the minority shareholders.

19      112.   In addition to causing financial harm to ATA, the transactions above
20 represent constructive dividend payments to Kedrin and Elizabeth, ATA's
21 controlling shareholders.  These transactions, benefitting Kedrin's and Elizabeth's
22 individual interests, prevented ATA from declaring dividends to Plaintiff and the
23 trusts he represents.

24 **O.     Benefits Taken By Adelaida as a Result of Kedrin's Self-Dealing, and**
25 **the Director Defendants' Breaches of Fiduciary Duties to ATA and Its**
26 **Shareholders in Allowing the Abuse of ATA Assets**

27      113.   Adelaida is in the business of purchasing and selling wine grapes,

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

---

THIRD AMENDED COMPLAINT

making premium wines, selling premium wines, and operating a winery with a tasting room.

114. Adelaida is controlled by Kedrin as a result of her control over Elizabeth, by reason of her status as Successor Trustee of the 1996 Trust, the controlling members in KMBG, the sole owner of Adelaida shares.

115. Adelaida has, through Kedrin and/or her fellow directors and managers at Adelaida, at least two of whom are also directors of Adelaida, engaged in non-arm's-length transactions with ATA resulting in Adelaida receiving substantial benefits at the expense of ATA and Plaintiff. Those transactions include the following:

    a. Obligating ATA to sell wine grapes to Adelaida for less than market value;

    b. Obligating ATA to pay for, cover, and/or subsidize Adelaida's overhead and operating expenses;

    c. Obligating ATA to incur the expense of administering Adelaida's payroll;

    d. Obligating ATA to allow Adelaida employees to participate in ATA's 401k plan, and make contributions for Adelaida employees;

    e. Using ATA equipment and paying ATA employees to manage, improve, and maintain Adelaida's properties and likely other properties owned by KMBG such Par Ranch and Hilltop Ranch;

    f. Loaning and/or advancing money to Adelaida at a zero or below market rate of return;

    g. Paying for legal services benefitting Adelaida and its owners only; and

    h. Without explanation, erasing "interrelated corporate debt" owed by Adelaida to ATA from ATA's financial statements.

116. Adelaida has not made its payments for wine grapes produced and

36.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

delivered by ATA to ATA.  Rather, Adelaida has paid Stoneway, an entity represented by Director Defendants to be a dba of Elizabeth.

117.   The transactions above have unjustly benefitted Adelaida, Kedrin, and/or Elizabeth at the expense of ATA and Plaintiff.  Given the ownership structure of KMBG and Adelaida, Kedrin and Elizabeth have diverted assets of ATA, directly benefitting themselves as owners of KMBG and Adelaida.  Plaintiff's Trusts have not benefitted in any way from the transactions described above.

## P.   ATA and Controlling Shareholder's Failure to Issue Dividends to Minority Shareholders While Simultaneously Taking Constructive Dividend Payments

118.   ATA has never paid a dividend to Plaintiff's Trusts.  In fact, the former CEO of ATA, Defendant Longorio, stated at the August 1, 2019 shareholder meeting that ATA's financial situation was "tough going" and that ATA needed all the financial resources it could muster to keep it afloat financially.  Despite this dire representation, through discovery in this action, Plaintiff has recently discovered significant subsidies and financial support being dedicated by ATA to Adelaida in all the ways described above.

119.   The representation by Defendant Longorio is inconsistent with the conduct discovered by Plaintiff in this action.  If ATA's financial situation is "tough going" then there is no legitimate reason for Director Defendants to authorize the subsidization of Adelaida at ATA's expense.  Yet, in supporting the interests of ATA's controlling shareholders' interests in Adelaida through the actions described above, ATA has declared excessive constructive dividend payments to the controlling shareholders, while refusing to make dividend payments to the minority shareholders.

37.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

**Q.     Requests for Corporate Records and Information**

120.   Alarmed by the conduct of Kedrin and the other Director Defendants described above, Plaintiff made multiple written requests to Director Defendants for ATA's and Adelaida's corporate records and information pursuant to Corporations Code section 1601, including written requests on the following dates: May 3, 2019; July 24, 2019; September 12, 2019; and September 20, 2019 (true and correct copies of the written requests are attached hereto as **Exhibit 3**).

121.   Director Defendants delayed their response to Plaintiff's statutory requests for corporate records and information.   The postponement of their obligations to Plaintiff, in turn, delayed Plaintiff's discovery of facts alleged by Plaintiff in this case.   Adelaida refused to disclose any corporate records whatsoever.

122.   The Director Defendants' response to Plaintiff's demand for corporate information was coordinated by conflicted outside counsel, Sabrina McTopy. (*See* allegations in paragraphs 84 through 86 above relating to Ms. McTopy's March 2019 email to Kedrin, Defendant Carter and others.)

123.   Director Defendants have not produced or made available for inspection all records and information requested by Plaintiff, in his capacity as Trustee for both Matthew's Trusts and Gretchen's Trusts.   Matthew's Trusts and Gretchen's Trusts are two Class B shareholders in ATA and, Plaintiff is informed and believes, ATA Ranches.   As a result, Director Defendants have breached their statutory and fiduciary duties and prevented the discovery of facts relevant to the Director Defendants' discharge and/or breaches of their fiduciary duties.

124.   Director Defendants have made misrepresentations about the existence and roles of entities to which requested documents relate.   Specifically, the Director Defendants represented that Stoneway was a seldom used "dba" of Elizabeth.   In fact, Stoneway is a separate and distinct entity, related somehow to

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

38.

Adelaida, with its own financial statements, income-generating assets, employees, and bank statements.

125.   Director Defendants have failed to comply with their discovery obligations under Corporations Code section 1601.  For example, ATA and the Director Defendants have refused to provide Plaintiff with all documents requested on the following subjects:

> a.   The purchase and sale of grapes under the Grape Purchase Agreement;
>
> b.   The use of human resources provided by ATA to Adelaida under the Agreement for Services;
>
> c.   Equipment expenses paid by ATA related to non-oilfield business operations;
>
> d.   Notes or loans made between ATA and other Defendants;
>
> e.   ATA's interest in airplanes, aircraft leases, or solar operations; and
>
> f.   Agendas, board packets, consents, minutes, or resolutions from ATA's Board of Director meetings relating to non-oilfield business.

126.   This conduct, which constitutes a further breach of the Director Defendants' fiduciary duties, has further prevented or delayed discovery of facts relating to Director Defendants' breaches of their fiduciary duties.

127.   Other acts constituting breaches of fiduciary duties or fraud may have occurred.  Plaintiff is unaware of those acts because he is being denied access to ATA's corporate documents and information.

**R.     Texas Litigation and Lessons Not Learned by ATA's Board**

128.   Plaintiff was forced to file a lawsuit in Texas against ATA and its parent, SDI, alleging breaches of fiduciary duties and oppression of minority shareholders by the individual directors on ATA's and SDI's Boards of Directors. That Texas litigation was resolved.

129.   One negotiated term of the resolution was a requirement that ATA and

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

1   its board of directors adopt a corporate Code of Conduct.  Attached hereto as

2   **Exhibit 4** is a true and correct unsigned copy of the Code of Conduct.

3   130.   The Code of Conduct was technically adopted, but has not been

4   adhered to by Director Defendants.

5   131.   It is clear from the allegations detailed above that ATA and its board

6   of directors learned nothing from the Texas litigation.

### DEMAND ALLEGATIONS

8   132.   Other than the claim for an order compelling production of corporate

9   records, Plaintiff brings this action derivatively in the right of and for the benefit

10  of nominal Defendants ATA and ATA Ranches to redress injuries suffered and to

11  be suffered by them as a result of the Director Defendants' breaches of fiduciary

12  duty, abuse of control, and gross mismanagement.  Plaintiff and his counsel will

13  adequately and fairly represent the interests of ATA and ATA Ranches in enforcing

14  and prosecuting their rights.  This is not a collusive action to confer jurisdiction on

15  this Court that it would not otherwise have.

16  133.   Plaintiff was a shareholder of ATA and ATA Ranches at the time of

17  the transgressions of which he complains and continues to be so.  Plaintiff is the

18  current Trustee for two Class B shareholders of ATA and, Plaintiff is informed and

19  believes, ATA Ranches.  Because ATA Ranches is a subsidiary wholly owned by

20  ATA, Plaintiff, as a shareholder of parent company ATA, asserts claims on behalf

21  of ATA Ranches through this Complaint.

22  134.   Prior to filing this lawsuit, Plaintiff, through his counsel, delivered

23  demand letters pursuant to Corporations Code section 800.  True and correct copies

24  of the demand letters are attached hereto as **Exhibit 5**.

25  135.   Based upon Director Defendants' acts and omissions, in direct

26  violation of their fiduciary duties of care, good faith, honesty, and loyalty, which

27  continue, ATA's Board rejected Plaintiff's demand and failed to take corrective

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

40.

action, appoint a special committee to investigate Plaintiff's claims, or bring the claims asserted in this action.

136.   Accordingly, Plaintiff has not made any further demand on the Director Defendants to investigate and prosecute the wrongdoing alleged herein.

137.   No demand was made upon ATA Ranches.  Such a demand would be a useless act because a majority of ATA Ranches' directors are not able to conduct an independent and objective investigation of the alleged wrongdoing.

138.   According to Adelaida's Statement of Information, filed with the California Secretary of State on April 3, 2019, Defendant Carter serves as an officer of Adelaida.  He is also an Adelaida Director.  According to ATA Ranches' Statement of Information, filed with the California Secretary of State on July 12, 2019, the only director of ATA Ranches is Defendant Carter.  Defendant Carter is also the general counsel for ATA.  Because of his position as an officer and a director of Adelaida, Defendant Carter is unable to take adverse action against Adelaida on behalf of ATA Ranches as a disinterested and independent board member.  Under these circumstances, any arguable requirement that a further demand be made on the Director Defendants is excused on the ground of futility.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### DERIVATIVE CLAIM FOR BREACHES OF FIDUCIARY DUTY

(Against Director Defendants, Defendant Kedrin, and Does 2-10)

139.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

140.   Defendants, as ATA's directors, officers, and majority shareholders were and are required to control and manage ATA and ATA Ranches to the best of their abilities in a fair, just, and equitable manner, refrain from abusing their positions of control, and not to favor their own interests at the expense of ATA,

41.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

ATA Ranches, and their shareholders.  Defendants violated and are continuing to violate their fiduciary duties to ATA, ATA Ranches, and their shareholders, including without limitation their duties of care, good faith, honesty, and loyalty.

141.  The wrongful conduct described above was not and is not due to an honest error in judgment, but rather to Defendants' inexcusable inattention, bad faith and/or reckless disregard of the rights and interest of ATA, ATA Ranches, and their shareholders.  Defendants have acted without the reasonable and ordinary care which they owe ATA, ATA Ranches, and their shareholders.

142.  As a result of the foregoing, Defendants have caused harm to ATA, ATA Ranches, and their shareholders, and have breached and are breaching their fiduciary duties by knowingly aiding, encouraging, cooperating, participating in, and/or substantially assisting the other Defendants in the breaches of their fiduciary duties.

143.  As a result of the actions and conduct alleged above, ATA, ATA Ranches, and their shareholders have sustained and will continue to sustain damages and injuries.  Those amounts will be determined according to proof at trial.

144.  In engaging in the actions and conduct alleged above, Defendants acted with recklessness, oppression, fraud, and malice.  Plaintiff and his trusts are, therefore, entitled to an award of punitive damages against Defendants.

**SECOND CAUSE OF ACTION**

**DERIVATIVE CLAIM FOR CORPORATE WASTE**

(Against Director Defendants and Does 2-10)

145.  Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

146.  As a result of the misconduct described above, and by failing to properly consider the interests of ATA and its shareholders, Director Defendants

42.

---

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

have caused ATA to waste valuable corporate assets.

147. Specifically, the Director Defendants authorized ATA's subsidies of Adelaida's failing business, one that has not earned a profit even with the subsidies during Kedrin's tenure as Adelaida's CEO. Those subsidies, described in detail above, include:

a. Forcing ATA to continue with its ownership of the HMR Ranch and Viking Ranch, the sole source of premium wine grapes used by Adelaida to make its wine, and to pay all of the expenses of owning and operating the ranches;

b. Forcing ATA to sell all of its wine grapes grown on the HMR and Viking Ranches to Adelaida at a fraction of their market value;

c. Allowing Adelaida to re-sell the ATA wine grapes it does not use on the open market for market value;

d. Forcing ATA to provide its own employees and professionals to perform tasks relating to Adelaida's business, not ATA's business, for little or no cost;

e. Forcing ATA to advance money in the tens of millions of dollars to Adelaida and/or its affiliates at no or below market interest;

f. Allowing Adelaida's owner to pay no or below market interest on the loan KMBG entered into with ATA to purchase its shares in Adelaida, and not enforcing the note when KMBG was in default;

g. Taking no action to sell the money losing HMR and Viking Ranches to stop the hemorrhaging of losses associated with owning them and raising capital for use in ATA's core business or for distribution to ATA's minority shareholders; and

h. Paying high-priced professionals – lawyer and accountants – to analyze and devise tax and legal structures that enable the program of

43.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

subsidies to continue without consideration to the resulting damage to ATA and its minority shareholders.

148.    ATA has sustained and will continue to sustain damages and injuries as a direct and proximate result of the misconduct of Director Defendants.

149.    Additionally, since Director Defendants engaged in intentional, willful, reckless, oppressive, and/or wanton conduct, Plaintiff is entitled to an award of punitive damages for the benefit of ATA.

**THIRD CAUSE OF ACTION**

**DERIVATIVE CLAIM FOR ACCOUNTING**

(Against Director Defendants and Does 2-10)

150.    Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

151.    As part of their ongoing fiduciary, contractual, and statutory duties to ATA, ATA Ranches, and their shareholders, Defendants are required to account for the transactions and occurrences about which Plaintiff complains in this Complaint.

152.    Prior to the filing of this Complaint, Plaintiff, as Trustee for both Matthew's Trusts and Gretchen's Trusts, demanded that Director Defendants account for the transactions and occurrences about which Plaintiff complains of in this Complaint.

153.    Director Defendants failed and refused to provide the requested accounting of the transactions and occurrences about which Plaintiff complains, thereby forcing Plaintiff to file this Complaint seeking the Court's order compelling the requested accounting.

44.

**FOURTH CAUSE OF ACTION**

**DERIVATIVE CLAIM FOR DECLARATORY RELIEF**

(Against All Defendants)

154.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

155.   An actual controversy exists between ATA on the one hand, and Adelaida on the other hand, as to the future rights and obligations of the parties arising under the 2016 Agreement for Services (**Exhibit 1**), the recently discovered 2017 Agreement for Services and the Grape Purchase Agreement (**Exhibit 2**).

156.   The 2016 Agreement for Services was executed by Elizabeth in April 2016.  Elizabeth was then declared unable "to adequately monitor and control her finances" in May 2016.  The Grape Purchase Agreement was executed by Kedrin in November 2016 on behalf of Adelaida Cellars, while she also served as a board of director for ATA.  The 2017 Agreement for Services was executed by Kedrin, on behalf of Adelaida, and Defendant Carter, on behalf of ATA.  Each was serving as a director of both parties to the contract at the time it was executed.

157.   Based upon the allegations set forth above, Plaintiff contends that all of the contracts were and are invalid and unenforceable or, at least, voidable.

158.   Plaintiff is informed and believes and, on that basis alleges, that Defendants dispute Plaintiff's contention and contend that the contracts are valid.

159.   Plaintiff desires a judicial determination of and declaration on these contract issues.

160.   A judicial declaration is necessary and appropriate at this time in order to allow Plaintiff and Defendants to ascertain their rights and obligations with respect to the contracts and to avoid a multiplicity of actions.

45.

**FIFTH CAUSE OF ACTION**

**DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER**

(Against Defendant Kedrin, Defendant Elizabeth, and Does 2-10)

161.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

162.   Defendant Elizabeth and Defendant Kedrin, as the representative of Elizabeth and her trusts, are collectively the controlling shareholder of ATA.  They owe fiduciary duties to Plaintiff and the trusts he represents, and ATA's other minority shareholders.  Kedrin and Elizabeth are required to act with the highest obligations of good faith, loyalty, fair dealing, due care and candor.  These duties obligate them to refrain from abusing their position of control over ATA to benefit themselves or another entity in which they own substantial interests, like Adelaida, at the expense of the minority shareholders.

163.   As set forth above, by authorizing payments to themselves of constructive dividends in the form of financial gifts and subsidies from ATA to support their individual interests in KMBG/Adelaida, and preventing ATA from issuing dividends to Plaintiff and his trusts, Kedrin and Elizabeth have breached their fiduciary duties to Plaintiff and his trusts.

164.   As a result of Kedrin's and Elizabeth's breaches of their fiduciary duties, Plaintiff and his trusts have sustained and will continue to sustain damages and injuries including, but not limited to, unpaid dividends from ATA.  These damages are unique to Plaintiff's Trusts and are not incidental to the damages done by Kedrin and Elizabeth to ATA as a whole.  The amount of those damages will be determined according to proof at trial.

165.   In engaging in the actions and conduct alleged above, Defendants Kedrin and Elizabeth acted with recklessness, oppression, fraud, and malice.

46.

Plaintiff and his trusts are, therefore, entitled to an award of punitive damages against said Defendants.

### SIXTH CAUSE OF ACTION

### DIRECT CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER

(Against Director Defendants, Adelaida, and Does 2-10)

166.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

167.   As described above, the Director Defendants and Adelaida possessed actual knowledge that Kedrin and Elizabeth owed fiduciary duties to ATA's minority shareholders, including Plaintiff and the trusts he represents.  Adelaida knew of those fiduciary duties through its CEO (Kedrin), its directors (Carter and Kedrin's step-son, Kieran), and other members of Adelaida's management who participated in the Financial Summit and later implemented and/or continued the plan agreed to at the Financial Summit whereby Adelaida received substantial financial benefits and subsidies underwritten by ATA.

168.   By taking constructive dividends in the form of financial gifts and subsidies from ATA to support their individual interests in Adelaida, and preventing ATA from issuing dividends to Plaintiff and his trusts, Kedrin and Elizabeth breached their fiduciary duties to Plaintiff and his trusts.

169.   The Director Defendants and Adelaida possessed actual knowledge that Kedrin and Elizabeth owed fiduciary duties to Plaintiff and were breaching their fiduciary duties to Plaintiff's Trusts.

170.   The Director Defendants and Adelaida gave substantial assistance and/or encouragement to Kedrin and Elizabeth in paying themselves constructive dividends in violation of their fiduciary duties.  The conduct of Defendants Kedrin, Elizabeth and Carter is described above.  The Director Defendants substantially

47.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

assisted and/or encouraged Kedrin and Elizabeth by failing to take action to prohibit the serial breaches of fiduciary duty by the controlling shareholders, also detailed above.

171.   The Director Defendants' and Adelaida's conduct in aiding and abetting Kedrin and Elizabeth was a substantial factor in causing Plaintiff and his trusts to sustain unique damages and injuries including, but not limited to, unpaid dividends from ATA.   Those amounts will be determined according to proof at trial.

172.   In engaging in the actions and conduct alleged above, said Defendants acted with recklessness, oppression, fraud, and malice.   Plaintiff and his trusts are, therefore, entitled to an award of punitive damages against said Defendants.

**SEVENTH CAUSE OF ACTION**

**DIRECT CLAIM FOR ORDER COMPELLING PRODUCTION OF CORPORATE RECORDS**

(Against Defendant ATA, Director Defendants, and Does 2-10)

173.   Plaintiff incorporates by reference the allegations set forth above as though fully restated herein.

174.   Plaintiff made his written request for corporate records and information to Defendant Longorio, the former CEO and President of ATA, on May 3, 2019.

175.   ATA belatedly produced some of the requested ATA corporate information, but not all the requested information.

176.   Plaintiff made his follow-up written request for ATA corporate information on July 9, 2019, to Defendant Longorio, the former CEO and President of ATA.

177.   Defendant Longorio initially failed to produce all the ATA corporate information requested by Plaintiff.   The information sought by Plaintiff was

48.

---

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

necessary to further his investigation into Defendants' wrongdoing described in this complaint.

178.   Plaintiff is informed and believes that Director Defendants' response to Plaintiff's demand for corporate information was coordinated and orchestrated by Defendant Carter and ATA's outside counsel Sabrina McTopy.

179.   Plaintiff was forced to retain legal counsel to assist him in enforcing his statutory inspection rights under California Corporations Code section 1601.

180.   The ATA response to the requests for corporate information was orchestrated by outside counsel Sabrina McTopy, who is conflicted by way of her association with Kedrin.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself, ATA, and ATA Ranches prays for judgment as follows:

A.     Declaring that Director Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ATA and ATA Ranches;

B.     Determining and awarding to ATA and ATA Ranches the damages sustained by them as a result of the violations set forth above from each of the Director Defendants, jointly and severally, together with interest thereon;

C.     Directing ATA, ATA Ranches, and Director Defendants to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect ATA, ATA Ranches, and their shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for appropriate amendments to ATA's and ATA Ranches' Bylaws or Articles of Incorporation;

D.     Enjoining the Director Defendants from engaging in ongoing conduct that constitutes breaches of their fiduciary duties, corporate waste and conversion;

49.

E.      Determining and awarding to ATA and ATA Ranches exemplary damages against Director Defendants in an amount necessary to punish Director Defendants, including but not limited to Kedrin, and to make an example of said Defendants to the community;

F.      Attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of ATA, ATA Ranches, and their shareholders, has an effective remedy;

G.      Declaring that the controlling shareholders, Elizabeth and Kedrin, breached their fiduciary duties to the minority shareholders by paying themselves constructive dividends and preventing dividends from being paid to the minority shareholders, and awarding damages for those breaches.

H.      Declaring that the Director Defendants and Adelaida aided and abetted Kedrin and Elizabeth in their breach of fiduciary duties to the minority shareholders, and awarding damages for those breaches.

I.      Declaring Director Defendants, Kedrin, and Adelaida liable under the common law of unjust enrichment;

J.      Compelling the production of requested corporate records, information from Director Defendants;

K.      Compelling an accounting of the financial transactions between ATA and ATA Ranches, on the one hand, and Adelaida;

L.      Removing and replacing Kedrin Van Steenwyk as Successor Trustee of the 1996 Trust and/or as a director and officer of ATA and ATA Ranches;

M.      Awarding to Plaintiff his costs and disbursements incurred in this action, including reasonable attorneys' fees, accountants' fees and expert witness fees, costs and expenses; and

N.      Awarding such other relief as this Court may deem just and proper.

50.

THIRD AMENDED COMPLAINT

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: November 24, 2020          SPERTUS, LANDES & UMHOFER, LLP

_____

MATTHEW D. UMHOFER, ESQ.
Attorneys for Plaintiff

THIRD AMENDED COMPLAINT

## **VERIFICATION**

I, Matthew Donald Van Steenwyk, verify that I am a shareholder of ATA and ATA Ranches. I have reviewed the allegations in this Verified Shareholder Complaint. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on *24 Nov `20*.

Matthew Donald Van Steenwyk

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

52.

THIRD AMENDED COMPLAINT

# EXHIBIT 1

## AGREEMENT FOR SERVICES

This Agreement for Services ("**Agreement**"), effective April 1, 2016, is between Scientific Drilling International, Inc. and Applied Technologies Associates, Inc. (collectively, "**ATA**") and KMBG, LLC and Adelaida Cellars, Inc. (collectively, "**Adelaida**").

This Agreement documents Adelaida's retention of ATA to provide limited administrative, legal, and other services (collectively, "**Services**").

1. **Scope of Services.** ATA agrees to render the following Services to Adelaida at the following service levels:

   a.    financial and accounting services including preparation of monthly financial statements from Adelaida's general ledger accounts and preparation of all related state and federal sales, employer, and income tax returns; and

   b.    legal consultation services including routine matters relating to contractual arrangements and negotiations, insurance placement, risk assessments, and general advice; and

   c.    administrative services including routine human resources support and advice and health, safety, and environmental inspections and training; and

   d.    construction and maintenance support and service including routine maintenance and repair; and

   e.    technical services including such computer information systems and technical support services as ATA has historically provided to Adelaida.

2. **Term.** This Agreement will remain in effect until terminated by either party by giving the other party 60 days written notice to that effect. Otherwise, the term of this Agreement will be the period from the date hereof until the date of termination of this Agreement.

3. **Compensation.** Adelaida will pay ATA a flat monthly service fee of $2,000.00 for Services rendered under this Agreement. Billing and payment will occur monthly in arrears with payment due within 30 days of Adelaida's receipt of ATA's invoice.

4. **Reasonable Efforts.** ATA agrees to use reasonable efforts to timely and accurately render Services to Adelaida. "Reasonable efforts" means, with respect to a given service, the efforts that a reasonable person in the position of ATA would use to deliver that service as expeditiously as possible.

**Exhibit 1**
**Page 53**

5.    *Compliance with Laws.* ATA will, in rendering Services contemplated by this Agreement, observe and comply with all applicable federal, state, and local laws, ordinances, regulations, and rules.

6.    *Limitation.* Notwithstanding any of the other terms or conditions found in this Agreement, neither party will be liable for any indirect, consequential, exemplary, punitive, special, or speculative damages of any type or character (including, but not limited to, loss of profit, use, contract, lease, or production or increased costs) arising from or related in any way to this Agreement or Services rendered.

7.    *Governing Law.* This Agreement and Services rendered will be governed by and construed and interpreted in accordance with the laws of the State of California without regard to its conflict of law principles.

8.    *Warranties.* ATA does not guarantee results.   **ATA MAKES NO WARRANTIES OR REPRESENTATIONS, IMPLIED OR EXPRESS, WITH RESPECT TO SERVICES RENDERED**.

9.    *Independent Contractor.* ATA is not Adelaida's agent, but an independent contractor maintaining complete control over its employees and third-party service providers and subcontractors of every tier.

10.   *Force Majeure.* ATA will not be liable for delays due to unforeseeable causes or events beyond its reasonable control.

11.   *Access to Premises.* In order to enable ATA to render Services, Adelaida agrees to provide ATA's employees and its third-party service providers and subcontractors access to the facilities, assets, and books and records of Adelaida to the extent necessary for ATA to fulfill its obligations under this Agreement.

12.   *Cooperation.* The parties acknowledge and agree that: (i) it is impracticable to create an exhaustive Services list for the orderly operation of Adelaida and accordingly, Services listed in Section 1 present general outlines of the scope of Services to be provided by ATA; and (ii) the parties will act in good faith and reasonably cooperate with one another during the term hereof in order for ATA to provide the necessary Services to Adelaida.

13.   *Confidentiality*.

a.    Each party agrees to keep confidential all information that the other party provides to it (*"**Proprietary Information**"*).   The party providing Proprietary Information will be referred to as *"**Discloser**,"* while the party receiving Proprietary

2

Exhibit 1
Page 54

Information will be referred to as "*Recipient.*" Proprietary Information includes, but is not limited to, information related to the affairs, methods of operation, strategies, plans, or financial information of the Discloser. Proprietary Information does not include information that: (i) is or becomes available other than as a result of unauthorized disclosure by Recipient; (ii) is or becomes available to Recipient on a non-confidential basis from a source that, to the best of Recipient's knowledge, is not prohibited from disclosing such information to Recipient by a legal, contractual or fiduciary obligation to Discloser; or (iii) is or becomes developed by Recipient independently of any information disclosed by Discloser. Recipient agrees to use the Proprietary Information only for the purposes of performing its obligations under this Agreement. Recipient will not, without first obtaining the written consent of Discloser, disclose or permit dissemination of Proprietary Information to any third party for purposes other than the performance of this Agreement except (i) in response to a request or order of a governmental authority or (ii) as otherwise required by applicable law.

b.      If Recipient is requested or required to disclose any Proprietary Information (i) in response to a request or order of a governmental authority or (ii) as otherwise required by applicable law, it will provide Discloser with prompt written notice of such request or requirement so that Discloser may seek a protective order or other appropriate remedy. If, in the absence of a protective order or other remedy or the receipt of a waiver from Discloser, Recipient is nonetheless, in the written opinion of counsel, legally compelled to disclose Proprietary Information, Recipient may, without liability under this Agreement, disclose such Proprietary Information.

**14.    *No Authority to Contract.*** Nothing contained herein will be construed to give either party any authority to execute any contract or to otherwise legally bind the other party.

**15.    *Successors and Assigns.*** This Agreement will extend to and bind the respective successors and assigns of the parties hereto, but neither party may assign or transfer this Agreement, or any right or obligation hereunder, to any third party without the prior written consent of the other party.

**16.    *Modification.*** This Agreement may only be modified by a writing executed by both parties.

**17.    *Integration.*** This Agreement expresses the complete agreement of the parties as of the time of execution, and all prior written or oral and contemporary oral agreements are superseded by this Agreement.

3

**Exhibit 1**
**Page 55**

The duly authorized representatives of the parties executed this Agreement to be effective as of the day and year first written above.

**Adelaida**


Elizabeth A. Van Steenwyk

**ATA**


Daniel R. Carter
Senior Vice President and General Counsel

4

**Exhibit 1**
**Page 56**

# EXHIBIT 2

## GRAPE PURCHASE AGREEMENT

This Agreement is between Adelaida Cellars, Inc. located at 5805 Adelaida Road, Paso Robles, California 93446 ("Winery") and Applied Technologies Associates, Inc. located at 3025 Buena Vista Drive, Paso Robles, California 93446 ("Grower"), who are singularly called "party" and collectively called "parties." The parties agree, as follows:

1.   Grower agrees to sell all the grapes grown in vineyards it owns to Winery. Winery agrees to purchase all the grapes grown in vineyards Grower owns.

2.   Grower will grant to Winery an unlimited right of entry to its vineyards for all purposes related to the grapes.

3.   Grower will bear the costs of delivery of the grapes to Winery and both parties acknowledge that the sale price per ton has been calculated taking into account the costs of transport.

4.   Grower will bear all labor costs associated with farming and harvesting the grapes and both parties acknowledge that the sale price per ton has been calculated taking into account the labor costs.

5.   Unless otherwise agreed in writing, title to and risk in the grapes will pass to Winery upon acceptance by Winery at its premises.

6.   For each harvest year, the price per ton will be 94% of the Weighted Average Grower Returns per Ton Delivered Basis (Table 6) paid for grapes of the same variety in District 8, as published in the *Final Grape Crush Report* by the California Department of Food and Agriculture, for the preceding harvest year.

7.   Grower will submit an itemized invoice to Winery on or before November 1 of each harvest year.

8.   Winery will pay one-half of the invoiced amount on or before December 31 and the balance of the invoiced amount on or before March 31 of the year following harvest.

9.   The term of this Agreement is for five years beginning 1 January 2016 and will automatically renew on each five year anniversary for an additional five year term unless terminated by either party by giving written notice to the other party at least 90 days prior to the end of the then-current five year term.

10. If any portion of this Agreement or the application thereof to any persons or circumstances should be found to be invalid by a court of competent jurisdiction, such invalidity will not affect the remaining portions or application thereof, which can be given effect without the invalid portion or application.

11. The validity of this Agreement and all causes of action, claims, damages, demands, disputes, losses, and suits arising hereunder will be construed, interpreted, and governed in accordance with the applicable laws of the State of California without regard to its conflict of law principles with venue being exclusive and proper in San Luis Obispo County, California.

12. This Agreement expresses the complete agreement of the parties as of the time of execution, and all prior written or oral, and contemporary oral agreements are superseded by this Agreement.

Wishing to be legally bound, the parties caused this Agreement to be executed by their duly authorized representatives below.

**Applied Technologies Associates, Inc.**

Printed Name: Philip N Longorio
Date: 15 DEC 2016

**Adelaida Cellars, Inc.**

Printed Name: Kelvin Van Steenwyk
Date: 2 Nov 2016

**Exhibit 2**
**Page 57**

# EXHIBIT 3

# ADAMSKI MOROSKI MADDEN
# CUMBERLAND & GREEN LLP
ATTORNEYS AT LAW

Post Office Box 3835 • San Luis Obispo, California 93403-3835
T  805-543-0990 • F  805-543-0980 • *www.ammcglaw.com*

May 3, 2019

**<u>VIA U.S. MAIL</u>**

Philip Longorio
Chief Executive Officer
Applied Technologies Associates, Inc.
3025 Buena Vista Drive
Paso Robles, CA 93446

Re:     **Request For Inspection Of Books And Records of Applied Technologies Associates, Inc. Under Corporations Code Section 1601**

Dear Mr. Longorio:

This office represents Matthew Van Steenwyk ("Matt") and Gretchen V. Marsh, D.C. ("Gretchen"), two shareholders of one of Applied Technologies Associates, Inc.'s ("ATA") shareholders.  Pursuant to California Corporations Code section 1601, we hereby demand on behalf of Matt and Gretchen, the right to inspect the following accounting books, records and minutes of proceedings of ATA and to make copies or extracts therefrom on May 24, 2019, at ATA's offices at 3025 Buena Vista Drive in Paso Robles during ATA's usual business hours:

1.     A current list of the full name and last known business address or residence address of each shareholder of ATA;

2.     A current list of all current directors sitting on ATA's Board of Directors ("Board");

3.     Copies of ATI's articles of incorporation and bylaws, and all amendments thereto, together with any powers of attorney pursuant to which the articles of incorporation, bylaws and/or any amendments thereto were executed;

4.     Copies of ATA's federal and state income tax returns, for the five (5) most recent tax years;

5.     Copies of the financial statements of ATA for the five (5) most recent fiscal years of ATA, whether audited or reviewed;

6.     The following additional financial and accounting records of ATA:

---

Paso Robles Office:  1948 Spring Street • Paso Robles, CA 93446-1620 • T 805-238-2300 • F 805-238-2322

**Exhibit 3
Page 58**

Philip Longorio, CEO
Applied Technologies, Inc.
May 3, 2019
Page 2

    a.    Billings from ATA to Adelaida Cellars, Inc. for wine grapes sold and/or supplied by ATA;

    b.    The discounted price paid to ATA by Adelaida Cellars, Inc. for wine grapes sold and/or supplied by ATA as admitted in a December 20, 2018 email from David Neuhardt (*see*, **Exhibit A** hereto);

    c.    Payments made to ATA by Adelaida Cellars, Inc. for wine grapes sold and/or supplied by ATA to Adelaida Cellars, Inc.;

    d.    Human resources services provided by ATA to Adelaida Cellars, Inc.;

    e.    Payments made to ATA by Adelaida Cellars, Inc. for human resources services;

    f.    Business expenses of Adelaida Cellars, Inc., paid by ATA;

    g.    Employee expenses incurred by Adelaida Cellars, Inc. – i.e. salaries, benefits, retirement plan contributions, bonuses and other forms of compensation – paid or reimbursed by ATA;

    h.    The records reflecting the payments made by ATA to its directors, officers and/or managers of documents reflecting ATA's reporting of those payments to the taxing authorities, whether by Form 1099 or otherwise during the last five (5) years;

    i.    Compensation and payment records showing all direct and indirect payments made by ATA to Kedrin Van Steenwyk, during the last five (5) years, including direct and indirect distributions, fees, reimbursements, health insurance, tax distribution payments (i.e. distributions to pay taxes owned or penalties assessed), vehicle allowance, indirect benefits and/or the right to use any ATA assets;

    j.    The records relating to any loans from ATA to Kedrin Van Steenwyk, Adelaida Cellars, Inc. and/or any affiliate during the last five (5) years;

    k.    ATA's general ledger of accounts covering the last five (5) years.

**Exhibit 3**
**Page 59**

Philip Longorio, CEO
Applied Technologies, Inc.
May 3, 2019
Page 3

7.    The books and records of ATA relating to the following internal affairs of the
      ATA for the current and the past five (5) fiscal years, including:

      a.    Notices of meetings of ATA's Board and/or any of its committees during
            the last five (5) years;

      b.    Agendas and board packets for each meeting of ATA's Board during the
            past five (5) years;

      c.    Consents given by given by Directors to ATA's Board and/or management
            committee meetings during the last five (5) years;

      d.    Approvals given by Directors and/or its committee members at meetings
            held during the last five (5) years;

      e.    The minutes of meetings of ATA's Board and/or any of its committees
            during the last five (5) years, including records of the votes by the
            Directors and/or management committee members at Board meetings;

      f.    Resolutions of the ATA's Board and/or its committees during the last five
            (5) years;

8.    The following additional documents relating to the internal affairs and governance
      of ATA:

      a.    Corporate records relating to the billings from ATA to Adelaida Cellars,
            Inc. for wine grapes sold and/or supplied by ATA;

      b.    Corporate records relating to payments made to ATA by Adelaida Cellars,
            Inc. for wine grapes sold and/or supplied by ATA to Adelaida Cellars,
            Inc.;

      c.    Corporate records relating to the discounted price paid to ATA by
            Adelaida Cellars, Inc. for the wine grapes sold and/or supplied by ATA
            (*see*, **Exhibit A** hereto);

      d.    Corporate records relating to human resources services provided by ATA
            to Adelaida Cellars, Inc.;

**Exhibit 3**
**Page 60**

Philip Longorio, CEO
Applied Technologies, Inc.
May 3, 2019
Page 4

e. Corporate records relating to payments made to ATA by Adelaida Cellars, Inc. for human resources services;

f. Corporate records relating to business expenses of Adelaida Cellars, Inc. paid by ATA;

g. Corporate records relating to the employee expenses of Adelaida Cellars, Inc. – i.e. salaries, benefits, retirement plan contributions, bonuses and other forms of compensation – paid or reimbursed by ATA;

h. Corporate records relating to any financing obtained on behalf of ATA during the last five (5) years;

i. Corporate records evidencing the disbursement and use of any loan proceeds by ATA's management;

j. Corporate records relating to any discussions by and between the directors, officers and/or managers of ATA about its purchase of real property from Adelaida Cellars, Inc. and/or its exchange of properties with Adelaida Cellars, Inc.;

k. Corporate records relating to any discussions by and between the directors, officers and/or managers of ATA about the sale of wine grapes to Adelaida Cellars, Inc.;

l. Corporate records relating to any discussions by and between the directors, officers and/or managers of ATA about ATA's payment of overhead expenses of Adelaida Cellars, Inc.;

m. Wine grape contracts entered into between ATA and Adelaida Cellars, Inc. during the last five (5) years;

n. Wine grape contracts entered into between ATA and any entity other than Adelaida Cellars, Inc., during the last five (5) years;

o. The records relating to the approval of the contracts identified in Request 8(m) and 8(n) by ATA's Board, management committee, and/or managers.

**Exhibit 3
Page 61**

Philip Longorio, CEO
Applied Technologies, Inc.
May 3, 2019
Page 5


Matthew Van Steenwyk and Gretchen V. Marsh, D.O. are seeking to inspect the above-referenced books and records for the purpose of investigating the quality and certain details of the governance of ATA as well as questions of conflicts of interest and independence of ATA's management.  As you know, a member may bring an action to enforce the inspection rights under Corporation Code section 1601 and if the court finds the failure of the corporation to comply with the requirements of Section 1601 is without justification, the court may award an amount sufficient to reimburse the person bringing the action for the reasonable expenses incurred by that person, including reasonable attorneys' fees, in connection with the action or proceeding.

As stated, the inspection of the records identified above will be by Matthew Van Steenwyk and his designee.  We expect that the records will be made available for our inspection and copying at ATA's offices. We look forward to hearing from you, and confirming the details of the inspection of on **May 24, 2019.**  Thank you in advance for your courtesy and cooperation.

Very truly yours,

ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP

MARTIN P. MOROSKI

MPM:tf
G:\VanSteenwyk\Cor\Longorio 050319.docx
Enclosures

cc:   Matthew Van Steenwyk (via email only)
      Gretchen V. Marsh, D.O. (via email only)
      Thomas J. Madden, Esq. (via email only)
      Chase W. Martin, Esq. (via email only)
      George Olguin (via email only)

**Exhibit 3**
**Page 62**

# ADAMSKI MOROSKI MADDEN
# CUMBERLAND & GREEN LLP
ATTORNEYS AT LAW

Post Office Box 3835 • San Luis Obispo, California 93403-3835
T  805-543-0990 • F  805-543-0980 • *www.ammcglaw.com*

July 24, 2019

**VIA EMAIL ONLY**

Sabrina McTopy, Esq.
Jackson Walker LLP
1401 McKinney, Suite 1900
Houston, Texas 77010
Email: smctopy@jw.com

Re:  **Request For Inspection Of Books And Records of Applied Technologies Associates, Inc. Under Corporations Code Section 1601**

Dear Ms. McTopy:

We write in follow-up to our letter of May 3, 2019 to Phil Longorio on behalf of our clients Matthew Van Steenwyk ("Matt") and Gretchen V. Marsh, D.C. ("Gretchen"), shareholders of Applied Technologies Associates, Inc. ("ATA").  Through your office, ATA has produced some of the documents and information we requested in our May 3 letter. Pursuant to California Corporations Code section 1601, we hereby demand, on behalf of Matt and Gretchen, the right to inspect and copy the following additional documents relating to ATA, that have not been produced by ATA, on or before **August 9, 2019**:

3.  Copies of ATA's articles of incorporation and bylaws, and all amendments thereto, together with any powers of attorney pursuant to which the articles of incorporation, bylaws and/or any amendments thereto were executed;

    **Follow-up request:**  On June 14, 2019, ATA produced bylaws dated July 28, 2010 ("Amendment to Amended and Restated By-Laws of Applied Technologies Association, Inc.") Is this the most current set of ATA's bylaws? If not, we request that ATA produce the most current bylaws;

6.  The following additional financial and accounting records of ATA:

    a.  Billings from ATA to Adelaida Cellars, Inc. for wine grapes sold and/or supplied by ATA;

    **Follow-up request:** Produce the source documents supporting the amounts reflected in the "Grape Invoices-ATAR to ACI Summary" document ATA produced in response to this request, a copy of which is attached hereto as

**Exhibit 3**
**Page 63**

Sabrina McTopy, Esq.
Jackson Walker LLP
July 24, 2019
Page 2

**Exhibit 1**, including, but not limited, the itemized invoices ATA submitted to Adelaida pursuant to paragraph 7 of Grape Purchase Agreement, documents referring to the transportation of grapes to Adelaida and any tickets evidencing the weight of each load of grapes ATA transported to Adelaida;

d.      Human resources services provided by ATA to Adelaida Cellars, Inc.;

**Follow-up request:** On June 14, 2019, ATA produced two agreements between SDI/ATA and KMBG, LLC/Adelaida for services rendered by SDI/ATA to KMBG, LLC/Adelaida, dated January 22, 2013 and April 1, 2016. According to Paragraph 1 of the agreements, ATA has been and is continuing to provide a number of services to Adelaida for a flat fee of $2,000 per month. Those services include preparation of Adelaida's monthly financial statements and income tax returns, legal consultations, human resource inspections and training, construction and maintenance support (which includes repairs) and computer technical support. We request that ATA produce any and all documents relating to these services, including, but not limited to, ATA invoices to Adelaida, ATA purchase orders, documents tracking ATA's activity, progress and/or completion of the services it is rendering, documents relating to and/or referring to the number of ATA employees being used to perform such services, ATA's general ledger detail reports relating to such services, Adelaida's financial statements and income tax returns (including drafts) prepared by ATA and documents relating to and/or referring to any construction and maintenance support that ATA has provided to Adelaida;

e.      Payments made to ATA by Adelaida Cellars, Inc. for human resources services;

**Follow-up request:** No documents evidencing Adelaida's payments to ATA under the agreements for services between SDI/ATA and KMBG, LLC/Adelaida dated January 22, 2013 and April 1, 2016, were produced by ATA. We request that ATA produce the requested payment information;

k.      ATA's general ledger of accounts covering the last five (5) years.

**Follow-up request:** ATA produced trial balance showing total credits and debts but it did not produce the requested general ledger **detail** for all of ATA's accounts. We request that ATA produce the requested general ledger detail for all

**Exhibit 3**
**Page 64**

Sabrina McTopy, Esq.
Jackson Walker LLP
July 24, 2019
Page 3

of ATA's accounts, including, but not limited to, the detail relating to ATA's Non-Oil Field Business (ranch operations and vineyard operations);

**Follow-up request:** Documents evidencing that KMBG reimbursed Stoneway Properties/ATA for its payments of KMBG's property taxes reflected in the spreadsheet attached hereto as **Exhibit 2**. The documents should include, but not be limited to, property tax bills/invoices, copies of checks, and/or any other form of documentation evidencing reimbursement;

**Follow-up request:** Documents constituting the financial statements (e.g., income and expense and balance sheets) of Stoneway Properties and general ledger detail reports identifying its sources of income and expenses for the last five (5) years;

**Follow-up request:** Documents relating to the use of ATA manpower for the replanting of vineyards on any of the ranches whether owned by ATA or KMBG, including, but not limited to, hardscape and landscape around the winery or the vineyards, building and maintenance of any venues (e.g., wedding venue), greenhouses or other structures;

**Follow-up request:** Documents relating to Kedrin Van Steenwyk's business plan for her proposed new winery/vineyard operations as proposed by her in her buyout offer letter dated November 5, 2018, a copy of which is attached hereto as **Exhibit 3**;

**Follow-up request:** Documents evidencing the initial outlays, interest expenses, interest payments and principal payments for all notes between related parties given by ATA to any and all individuals and/or companies related to the company, A Shareholders, B Shareholders, including but not limited to DeVans, ATA Energy, Don and Elizabeth Van Steenwyk, Don Van Steenwyk, Elizabeth van Steenwyk, Kedrin Van Steenwyk, Brett Van Steenwyk;

**Follow-up request:** Documents relating to Note 14, Related Party Transactions, included in the Notes to Combined Financial Statement for SDI/ATA in which the combined entities identify 'receivables from related parties of $1.9M and $3.1M, losses of $1.0M, lack of timely payments, exceptionally low interest rates of 0.95% for arms length transactions, and finally a payoff sometime in 2018. Information should include the identity, amounts of interest paid, written off and

**Exhibit 3**
**Page 65**

Sabrina McTopy, Esq.
Jackson Walker LLP
July 24, 2019
Page 4

all derivations and working documents of the note from inception to final payment.

**Follow-up request**: Documents relating to all capital equipment expenses made by ATA for operation of the Non-Oilfield Business;

7. The books and records of ATA relating to the following internal affairs of the ATA for the current and the past five (5) fiscal years, including:

a. Notices of meetings of ATA's Board and/or any of its committees during the last five (5) years;

**Follow-up request**: Notices of meetings of ATA's Board of Directors relating to ATA's Non-Oilfield Business from July 28, 2010 to the present;

b. Agendas and board packets for each meeting of ATA's Board during the past five (5) years;

**Follow-up request**: Agendas and board packets for each meeting of ATA's Board of Directors relating to ATA's Non-Oilfield Business from July 28, 2010 to the present;

c. Consents given by Directors to ATA's Board and/or management committee meetings during the last five (5) years;

**Follow-up request**: Consents given by ATA's Board of Directors relating to ATA's Non-Oilfield Business from July 28, 2010 to the present;

d. Approvals given by Directors and/or its committee members at meetings held during the last five (5) years;

**Follow-up request**: Approvals given by ATA's Board of Directors relating to ATA's Non-Oilfield Business from July 28, 2010 to the present, including approvals for the selection or appointment of officers responsible for the general supervision of assets not used in the Corporation's Oilfield Business;

**Exhibit 3**
**Page 66**

Sabrina McTopy, Esq.
Jackson Walker LLP
July 24, 2019
Page 5

    e.     The minutes of meetings of ATA's Board and/or any of its committees during the last five (5) years, including records of the votes by the Directors and/or management committee members at Board meetings;

**Follow-up request:** The minutes of meetings of ATA's Board of Directors relating to ATA's Non-Oilfield Business from July 28, 2010 to the present, including records of the votes by the Directors relating to the process by which the officers responsible for the Non-Oilfield Business were identified and named;

    f.     Resolutions of the ATA's Board and/or its committees during the last five (5) years;

**Follow-up request:** Resolutions of the ATA's Board of Directors relating to ATA's Non-Oilfield Business from July 28, 2010 to the present;

**Follow-up request:** The names of the current officers for ATA's Non-Oilfield Business;

**Follow-up request:** A current list of assets not used in ATA's Oilfield Business that are managed by officers of ATA's Non-Oilfield Business;

**Follow-up request:** The name(s) of the person(s) directing/deciding the activities to redirect ATA's resources (e.g., invoicing, labor hours/manpower, capital investments, etc.) for the benefit of either the ranching operations or vineyard operations of KMBG, LLC and/or Adelaida and any documents relating to and/or evidencing those instructions/decisions;

**Follow-up request:** Documents evidencing and/or relating to Dan Carter's participation on the board of Adelaida Cellars, including, but not limited to, documents relating to his reports to ATA's management and/or board on the decisions made that have resulted in continued losses to ATA and/or Adelaida Cellars;

**Follow-up request:** Documents evidencing and/or relating to the reasoning behind ATA's decision to enter it an agreement with Adelaida for the purchase of grapes at cost other than actual cost, including, but not limited to, documents evidencing how the price basis was established, timing, oversight, and practice of

**Exhibit 3**
**Page 67**

Sabrina McTopy, Esq.
Jackson Walker LLP
July 24, 2019
Page 6

allowing complete and open access to a purchaser and rationale for sales of all grapes to a closely related entity without timely and competitive pricing;

**Follow-up request:** Documents relating to the "gag order" issued by ATA/SDI's board that prohibits its management from engaging in any discussion or conversations with shareholders of ATA/SDI, including, but not limited to, documents explaining why the "gag order" remains in effect;

8. The following additional documents relating to the internal affairs and governance of ATA:

h. Corporate records relating to any financing obtained on behalf of ATA during the last five (5) years;

**Follow-up request:** Documents evidencing repayments of funds advanced by SDI/ATA to KMBG/Adelaida for the operating costs of KMBG/Adelaida as referenced in the Executed SDI Chase Credit Agreement (Disclosure Cert) attached hereto as **Exhibit 4**;

**Follow-up request:** Documents evidencing repayments of financing, interest and other fees, if any, relating to any and all "intercompany" transactions between ATA, SDI, KMBG and/or Adelaida, including, but not limited to, any related entities having an interest in airplanes, aircraft leases, solar and/or any other related operations as referenced in the financial statements of SDI/ATA for the last five (5).

We reiterate to you what we stated in our letter of May 3, 2019. Matt and Gretchen are seeking to inspect the above-referenced books and records for the purpose of investigating the quality and certain details of the governance of ATA, as well as questions of conflicts of interest and independence of ATA's management. As you know, a member may file an action to enforce the inspection rights under Corporation Code section 1601 and if the court finds the failure of the corporation to comply with the requirements of Section 1601 is without justification, the court may award an amount sufficient to reimburse the person bringing the action for the reasonable expenses incurred by that person, including reasonable attorneys' fees, in connection with the action or proceeding. We have drafted a petition to compel ATA's compliance with our clients' request. It is our hope that it will not be necessary to file it.

**Exhibit 3**
**Page 68**

Sabrina McTopy, Esq.
Jackson Walker LLP
July 24, 2019
Page 7


     We expect that the requested records will be produced for our inspection in the same manner that was used with respect to the records ATA produced in response to our May 3, 2019 letter. Let us know if this is not the case.   We look forward to hearing from you.  Thank you in advance for your courtesy and cooperation.

                  Very truly yours,

                  ADAMSKI MOROSKI MADDEN
                  CUMBERLAND & GREEN LLP

                  MARTIN P. MOROSKI

MPM:go
G:\VanSteenwyk\Cor\McTopy 072419.docx
Enclosures

cc:     Clients (via email only)
        Thomas J. Madden, Esq. (via email only)
        Chase W. Martin, Esq. (via email only)
        George Olguin (via email only)

**Exhibit 3**
**Page 69**

# ADAMSKI MOROSKI MADDEN
# CUMBERLAND & GREEN LLP
ATTORNEYS AT LAW

Post Office Box 3835 • San Luis Obispo, California 93403-3835
T 805-543-0990 • F 805-543-0980 • www.ammcglaw.com

September 12, 2019

**VIA EMAIL ONLY**

Sabrina A. McTopy, Esq.
Jackson Walker LLP
1401 McKinney, Suite 1900
Houston, Texas 77010
Email: smctopy@jw.com

Re:   **Request For Inspection Of Books And Records of Applied Technologies Associates, Inc. Under Corporations Code Section 1601**

Dear Ms. McTopy:

We write in follow-up to our letter requests for corporate information relating to Applied Technologies Associates, Inc. ("ATA") dated May 3, 2019, and July 24, 2019. In response to your letter of August 9, 2019, our July 24 letter sought records that should have been produced or made available to my clients in response to the May 3 letter request. The requested records have still not been produced and our office has received no further word from you as to when they will be produced. To the extent the documents are not produced before the end of the month (September), we will file our petition seeking an order compelling their production that has already been drafted. Thank you for your attention to this matter.

Very truly yours,

ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP

MARTIN P. MOROSKI

MPM:tf
G:\VanSteenwyk\Cor\McTopy 091219.docx

cc:   Matt van Steenwyk (via email only)
      Gretchen V. Marsh, D.O. (via email only)
      Thomas J. Madden, Esq. (via email only)
      Chase W. Martin, Esq. (via email only)
      George Olguin (via email only)

**Exhibit 3
Page 70**

# ADAMSKI MOROSKI MADDEN
# CUMBERLAND & GREEN LLP
ATTORNEYS AT LAW

Post Office Box 3835 • San Luis Obispo, California 93403-3835
T  805-543-0990 • F  805-543-0980 • *www.ammcglaw.com*

September 20, 2019

**<u>VIA EMAIL ONLY</u>**

Roy E. Ogden, Esq.
Ogden & Fricks LLP
656 Santa Rosa St., Suite 2B
San Luis Obispo, CA 93401
Email: rogden@ogdenfricks.com

Re:  **Request For Inspection Of Books And Records of Applied Technologies Associates, Inc. Under Corporations Code Section 1601**

Dear Roy:

I write in follow-up to my two letters dated September 12, 2019, to Sabrina McTopy of the Jackson Walker firm. Copies of both are enclosed herewith.

The first is a follow-up to previous letter requests for corporate records of Applied Technologies Associates, Inc. ("ATA") under Corporations Code section 1601. As I state in that letter, my clients and I would like to receive the requested records before the end of this month.

The second letter is a new request. The Code of Ethics is something that ATA committed to adopting in a confidential settlement agreement with Matthew van Steenwyk in 2011. The Jackson Walker law firm should have a copy of the Code of Ethics in its files. My clients and I would like the Code of Ethics produced as soon as possible.

Thanks in advance for your attention to these requests. Please call or write in the meantime with any questions, or if you would like to discuss this matter.

Very truly yours,

ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP

MARTIN P. MOROSKI

MPM:tf
G:\VanSteenwyk\Cor\Ogden 092019.docx
cc:  Matt van Steenwyk (via email only)
Gretchen V. Marsh, D.O. (via email only)
Thomas J. Madden, Esq. (via email only)
Chase W. Martin, Esq. (via email only)
George Olguin (via email only)

Paso Robles Office:  1948 Spring Street • Paso Robles, CA 93446-1620 • T 805-238-2300 • F 805-238-2322

**Exhibit 3
Page 71**

# EXHIBIT 4

 Scientific Drilling/Applied Technologies

## CODE OF CONDUCT

Our policy is simple: we must each conduct all of our activities with the highest level of integrity and ethics, complying with the letter and the spirit of all applicable laws and regulations. In other words, we should avoid doing anything that may be, or even appear to be, illegal or unethical and all employees should endeavor to deal fairly and honestly with our vendors, customers, competitors, and each other.

This Code describes our standards of conduct and business practices. These standards apply to all directors and employees (collectively, "employees") of Scientific Drilling International, Inc. and Applied Technologies Associates, Inc. and their subsidiaries and affiliates (collectively, "SDI").

## OBLIGATIONS OF EACH EMPLOYEE

**Understand this Code:** We all have a responsibility to make sure our ethics and business practices program works. To fulfill this responsibility, you should read this Code thoroughly and become familiar with it. If you do not understand something in this Code, please seek out assistance from your supervisor.

**Comply with this Code, SDI Policies, and the Law:** Each employee must comply with the spirit and the letter of this Code, SDI policies, and all applicable laws and regulations. For employees this is a condition of continued employment. Failure to comply will result in disciplinary action, which may include immediate termination for cause.

**Communicate Actual or Suspected Violations:** We should all be alert and sensitive to situations that could result in violations of this Code, SDI policies, or the law. *Each employee has an obligation to report any conduct that may be a violation.*

Generally, these matters should be raised first with your immediate supervisor. This may provide valuable insights or perspectives and encourage resolution of problems within the appropriate area. However, if you are uncomfortable bringing this matter up with your supervisor, or you do not believe the supervisor has dealt with the matter properly, you should raise the matter with SDI's General Counsel, Dan Carter. All inquiries, however reported, will be handled on a confidential, "need-to-know" basis.

If you choose to communicate in writing, you should send your letter to SDI, Attention: General Counsel, 1100 Rankin Road, Houston, Texas 77073 or email to codeofconduct@scientificdrilling.com. If you prefer to remain anonymous, you may call 281-214-7540 and leave a message for the General Counsel.

Regardless of how a report is made, no employee will suffer any retaliation of any kind for reporting in good faith a violation or suspected violation of this Code, SDI policy, or the law. In addition, no employee will suffer any retaliation for filing any complaint with any government agency or for exercising any legal right.

Violations of this Code or with the laws and regulations applicable to SDI's business may subject an employee to corrective disciplinary action, up to and including termination for cause. In addition, any violations may also violate foreign, federal, state, or local laws and could subject an employee to individual civil or criminal prosecution with accompanying potential damages, fines, and imprisonment.

**How Can You Be Sure That You Are Doing The Right Thing:** No matter what your job, you make decisions every day that affect SDI and your co-workers. Sometimes, circumstances can blur the line between right and wrong. When in doubt, you should ask yourself:

**Exhibit 4**
**Page 72**

 Scientific Drilling/Applied Technologies

- ➢ Do I have all the information I need to make a good decision?
- ➢ Does my decision appear appropriate and ethical?
- ➢ Am I complying with the intent of SDI's policies?
- ➢ What could the impact on SDI be because of my actions?
- ➢ Would I want to read about it on the front page of the newspaper?

If your answer to any of these questions is not positive, it may be that whatever you are considering is the wrong thing to do and you should reach out to your supervisor or the General Counsel for help.

## POLICIES AND PRACTICES

Below are summaries of key SDI policies relating to ethics and business practices. *Compliance with these policies is a condition of each employee's continued employment.*

## CONFLICTS OF INTEREST

Conflicts of interest arise when there is opportunity for personal gain beyond the usual rewards of employment or when an employee's interests collide with SDI's interests. Each employee must avoid doing anything that compromises or appears to compromise his judgment or that places or appears to place his personal interests and SDI's interests at odds.

Conflicts of interest can arise whenever you hold a significant interest in, engage in outside work for, or receive any personal benefit or gift from any of our vendors, suppliers, contractors, customers, or competitors. Conflicts also arise when you compete with SDI or when you are presented with a business opportunity that is received due to your position with SDI and in which SDI may be interested.

It is impractical to list every activity that might constitute a "conflict of interest." There are also many borderline situations that need evaluation based on all relevant information. When in doubt, ask your supervisor. The following are typical conflict of interest situations and SDI policy with respect to each:

**Corporate Opportunities:** All employees are prohibited from taking for themselves opportunities that are discovered using corporate property, information, or position. No employee may use corporate property, information, or position for improper personal gain, and no employee may compete with SDI directly or indirectly. Each employee owes a duty of loyalty to SDI to advance its legitimate business interests when the opportunity to do so arises.

**Outside Work:** Employees must not work for, or conduct any outside business with, a competitor. Employees may not be engaged in any manner by a competitor of SDI.

**Gift and Business Entertainment:** Accepting gifts or entertainment from those SDI does business with could be perceived to influence decisions or create a sense of obligation. In addition, offering gifts and entertainment to our customers can raise similar issues. To ensure the highest level of objectivity in dealing with SDI's vendors, suppliers, contractors, customers, competitors and representatives, and to avoid the appearance of impropriety, you should not accept or offer any gift or entertainment unless it:

- ➢ is unsolicited and offered infrequently;
- ➢ is reasonable in its value and scope;
- ➢ is customary and part of your normal business practices to accept or offer the item;
- ➢ does not impose or create the appearance of imposing a sense of obligation on either the giver or the recipient, and

2011 Code of Conduct                                                                                          3

**Exhibit 4**
**Page 73**

 Scientific Drilling/Applied Technologies

> does not create the appearance that your business judgment can be influenced.

### Questions and Answers

I am thinking about starting my own outside business to bring in some extra income. Would this be a conflict of interest?

> An outside business activity does not necessarily create a conflict of interest situation. If your outside business activity did not compete with SDI, and your participation in this business was accomplished outside your normal work hours and did not adversely impact your ability to do your job, this would probably not be a conflict of interest. However, you should review the matter with your supervisor before starting the activity.

I'm thinking about taking a potential customer to an exclusive resort. Would this be acceptable?

> If the purpose of this activity is to help build a good working relationship with the potential customer, then it would be acceptable. However, the activity would be against company policy if it was (i) offered in return for securing the potential customer's business or (ii) an attempt to compromise the potential customer's ability to make objective and fair business decisions.

What are the guidelines if I have a relative who works for one of SDI's competitors?

> There is nothing wrong with relatives (or other personal relations) working for competitors or suppliers. However, you should be doubly aware of any potential conflict of interest (e.g., there should be no discussion or exchange of sensitive information). If you sense the possibility of a potential conflict, disclose the situation to your supervisor.

### SDI INFORMATION, RECORDS, AND PROPERTY

SDI property including SDI information, equipment, funds, supplies, facilities and other assets, as well as services and labor of other SDI employees, must be used only for legitimate business purposes on behalf of SDI. Employees may not take for themselves personally opportunities that are discovered using SDI property or information or which arise due to their position at SDI. All SDI records must be kept fully and accurately, and SDI confidential information must be protected at all times.

**Confidential SDI Information:** During employment with SDI, employees will learn and be entrusted with confidential information relating to SDI's operations, financial condition, and potential transactions (including acquisitions). Some examples of information that is confidential include technical information, engineering data and calculations, financial information, business projections, personnel records, and any information that is marked confidential. Because this information has substantial value to SDI, employees must not disclose any confidential information, even inadvertently, to any unauthorized person in or outside SDI. *This obligation continues after your employment ends.*

**Maintaining Accurate Books and Records:** Each employee must maintain accurate and complete business records. It is against SDI policy, and in some circumstances illegal, for any employee to cause books and records to be inaccurate in any way. Some examples of prohibited record keeping include making the records appear as though payment were made to one person when in fact they were made to another, setting up unauthorized funds or accounts, and submitting expense accounts that did not accurately reflect the true nature of the expenses.

**Exhibit 4**
**Page 74**

Scientific Drilling/Applied Technologies

We must ensure that SDI provides full, fair and accurate, timely and understandable disclosure in all reports and documents filed with any governmental agency, as well as in all public communications and disclosures. Employees must immediately inform the General Counsel of any significant issues they become aware of relating to SDI's accounting or auditing policies or practices or our financial statements.

**Representing SDI:** No employee should, under any circumstances, act as a potential spokesperson for SDI in response to inquiries by the news media, financial analysts, or other similarly interested persons. Employees should not grant interviews or release statistical or printed information of any kind. If you are approached for information, you should politely forward all requests to the CEO.

**SDI Systems, Electronic Media, and Services:** SDI-supplied systems, including our computer systems, e-mail system, telephones, voice mail, fax machines, on-line services, and internet access belong to SDI and not to employees. Use of these systems for personal reasons in any manner that is abusive, excessive, or unauthorized (including the posting of confidential information on social media sites) is against SDI policy. *We reserve the right to monitor and audit each employee's use of SDI's systems (e.g., e-mail and the internet), as well as social media sites.*

Use of the computer systems to make, download, or forward discriminatory, harassing, derogatory, obscene, defamatory, threatening, or offensive remarks to other people is prohibited. In addition, downloading, transmitting, or creating, through the Internet or otherwise, material that is offensive or illegal because of characteristics such as race, sex, sexual orientation, or national origin is prohibited.

**Privacy of Personal Information:** Records containing information about employees, customers, investors, vendors, and suppliers must be kept confidential. Access to these records is limited to those employees with a specific need to use the information in the performance of their duties.

### Questions and Answers

My group is receiving new personal computers and printers. The local elementary school in my neighborhood could really use the old equipment. May I donate it to the school on SDI's behalf?

> Though company equipment may be obsolete, there are other factors that must be considered before the company chooses to discard or donate it, such as accounting practices and corporate contribution policies. Therefore, check with your supervisor for initiation of a donation request before making a donation of company property.

If a supplier inadvertently leaves a document in my office that is related to a competitor's product, can I keep or make a copy of the document and share it with others to benefit SDI?

> No. The document may be confidential and cannot be disclosed without proper authorization. Reviewing it would violate our policy and may lead to a lawsuit. Once such a document is discovered, it should be brought to the attention of your supervisor and the General Counsel.

## CONDUCT IN THE WORKPLACE

We are committed to providing a safe, diverse, and tolerant work environment, free of discrimination and harassment of all kinds. As an employee, you are expected to treat others with the same respect and dignity you wish for yourself. *No discrimination or harassment of any employee will be tolerated.*

**Exhibit 4**
**Page 75**

 Scientific Drilling/Applied Technologies

**Equal Employment Opportunity:** We are committed to affirmatively provide equal employment to all qualified employees and qualified applicants without regard to race, color, ancestry, national origin, religion, sex, marital status, age, sexual orientation, legally protected disability, status in the US uniformed services, status as a disabled veteran, or on any other basis protected under applicable law.

Our policy of equal opportunity affects all employment practices including, but not limited to, recruitment, employment, assignments, training, compensation, benefits, promotions, transfers, layoffs, and termination. Employment decisions must be based solely on job-related experience or education requirements, an individual's qualifications, and the ability to perform the duties of the specific job.

**Sexual and Other Workplace Harassment:** We will not tolerate harassment in the workplace in any form or manner including, but not limited to, sexual harassment. We believe that all employees should enjoy a work environment that is free from discrimination, harassment, and intimidation. This applies to all of our employees, applicants, vendors, contractors, or guests.

Sexual harassment is behavior of a sexual nature that is not welcome by another and is personally offensive, debilitates morale, creates an intimidating, offensive, or hostile environment, or otherwise adversely affects the employment opportunities of our employees or interferes with work effectiveness.

Workplace harassment is verbal or physical conduct that adversely affects employment opportunities, creates an intimidating, offensive, or hostile environment, or interferes with an employee's work performance.

This policy applies to all SDI functions and all times and places where employees are functioning in a SDI-related activity or are required by SDI to be present.

SDI will investigate claims and, where appropriate, take corrective action. Any employee who believes that he or she is the subject of harassment should promptly inform the General Counsel. *Anyone employed by SDI who engages in harassment does so in violation of SDI policy and is subject to immediate termination for cause.*

**Violence in the Workplace:** The safety and security of our employees is very important. Threats or threatening behavior or acts of violence against employees, visitors, guests, or others by anyone on SDI property or while representing SDI will not be tolerated. *Violations of this policy will lead not only to disciplinary actions, which may include immediate termination for cause, but also to arrest.* Any employee who engages in violent behavior will be removed from the premises as quickly as safety permits and will not be allowed to return pending the outcome of an investigation.

### Questions and Answers

What if my supervisor starts to play favorites with job assignments and overtime, and I begin to feel discriminated against? What should I do?

> You should tell your supervisor in clear and specific terms that you feel you have not been treated fairly in terms of job assignments and overtime. If you feel your supervisor has not responded to your concerns in a fair manner, take advantage of the other reporting channels available to you and identified in this Code.

If I had a manager that kept asking me out socially after work, even though I had no interest and had continually refused his invitations, what should I do?

**Exhibit 4**
**Page 76**

 Scientific Drilling/Applied Technologies

Tell him no. You should immediately report the situation to Human Resources.

If I receive a call from another company requesting a reference check on a former SDI employee, how should I handle the call?

You should not provide any information, but should politely refer the caller to Human Resources. By establishing Human Resources as a clearinghouse for all reference requests, we can ensure that the information we release is accurate, authorized, and representative of the SDI's position.

## COMPLYING WITH LAW

Each employee must adhere to the letter and spirit of all laws and regulations in effect where SDI does business. We are each responsible for knowing the laws applicable to the performance of our job.

**Bribes and Kickbacks:** We will not condone any payment by any employee to any third party that is in the nature of a bribe, kickback for obtaining any business, or otherwise results in a special favor to SDI or its employees.

Gifts or payments may not be offered or given on behalf of SDI to any government official, political party, or candidate for public office either in the US or abroad. These payments may be in violation of federal law and could result in the imposition of fines or imprisonment or both.

**Payments to Government Officials:** The laws of the US and foreign countries prohibit companies and their employees and representatives from offering, promising to pay, or authorizing payment of any money or anything of value to any government official, any political party or official, or any candidate for political office, for the purpose of influencing any act or decision of that official, party, or candidate in his or its official capacity. Companies and their employees and representatives are also prohibited from taking any of these actions for the purpose of inducing the official, party, or candidate to use his or its influence to affect or influence any act or decision of a government or any agency thereof.

The US Foreign Corrupt Practices Act ("**FCPA**") prohibits bribery or unlawful payments to any official or employee of a foreign government or agency for the purpose of influencing decisions or obtaining or retaining business. In some foreign countries, small tips or gratuities (commonly referred to as facilitating payments) to low level government personnel to induce the performance of basic ministerial or clerical functions, or to provide routine services, are not categorically illegal. However, it is important to remember that local foreign law may be more restrictive than the FCPA.

*SDI requires full and absolute compliance with the FCPA by all of its employees, representatives, and distributors.* If you become aware of any FCPA violation or potential violation, you must immediately notify the CEO and the General Counsel.

**Antiboycott:** In the mid-1970's, the US adopted antiboycott laws to counteract the participation of US firms and their foreign subsidiaries in boycotts or embargoes that the US does not sanction. These laws have the effect of preventing US firms from being used to implement foreign policies of other nations which run counter to US policy. The Arab League boycott of Israel is the principal foreign economic boycott that US firms must be concerned with today. The antiboycott laws, however, apply to all boycotts imposed by foreign countries that are unsanctioned by the US.

*SDI is required to comply with all antiboycott laws and may have an obligation to report any attempt to*

**Exhibit 4
Page 77**

Scientific Drilling/Applied Technologies

*require its participation as a condition of contract award.* If you become aware of any violation or potential violation of an antiboycott law, you must immediately notify the General Counsel.

**Governmental Investigations and Legal Actions and Proceedings:** SDI's policy is to cooperate fully with any governmental investigation and any legal action or proceeding. Appropriate handling of these matters is important for all of us as the laws regulating our business provide for civil and criminal penalties that may apply to SDI and its employees. If you receive a subpoena or any other legal document or are contacted by any person regarding a legal action, proceeding, or investigation that involves or may involve SDI, you must contact the General Counsel immediately.

Employees should never, under any circumstances, destroy or alter any SDI documents in anticipation of any investigation, action, or proceeding or in anticipation of a request for those documents from any governmental agency, court, or participant in any action or proceeding. In addition, employees should never lie, make any misleading statements, or attempt to cause any other SDI employee or any other person to fail to provide information or to provide any false or misleading information in connection with any investigation, action, or proceeding.

Any questions regarding the propriety of destroying or altering SDI documents should be referred immediately to the General Counsel.

**Fair Dealing:** We seek to outperform our competition fairly and honestly. Each employee should respect the rights of and deal fairly and honestly with SDI's suppliers, customers, competitors, and vendors. Stealing proprietary or confidential information or possessing trade secret information that was obtained without the owner's consent is prohibited.

**Political Contributions:** Generally, US and foreign laws prohibit corporations from making contributions or expenditures in connection with any election for political office. These laws also prohibit corporations from financially supporting political candidates. Political contributions include direct or indirect payments, advances, gifts of goods or services, subscriptions, memberships, purchase of tickets for fundraisers, and purchase of advertising space. No employee shall make any political contribution or other expenditure to any political organization or candidate for political office on behalf of or for the benefit of SDI.

**Antitrust and Competition Laws:** Antitrust and competition laws regulate SDI's relationships with its vendors, customers, and competitors. While these laws are complex and broad, generally, they prohibit agreements, arrangements, and activities that may have the effect of reducing competition. SDI is committed to free and competitive markets. No employee may enter into any agreement or arrangement, or engage in any activity, with vendors, customers, or competitors that may lessen competition.

**Health, Safety, and the Environment:** SDI is committed to protecting the health and safety of our employees and to environmental stewardship. *Working safely and protecting others and the environment are conditions of employment at SDI.*

## Questions and Answers

I will be attending a trade association meeting next month and I am curious about our chances for receiving a contract award. I would like to discuss this with other bidders who will be there. Is that all right?

      No.   You should not discuss bids, contract terms, or similar proprietary business

**Exhibit 4**
**Page 78**

 Scientific Drilling/Applied Technologies

information with employees of competitors. This might give others an unfair advantage, and it might create an antitrust problem. Don't initiate such conversations or respond to any outside inquiries.

Is it permissible for a business representative to entertain a government decision maker by taking her on an extravagant outing in an effort to speed up a decision on a matter?

> Generally the law prohibits any payment, whether direct or, as in this case, indirect, whose purpose is to influence a government employee's behavior. The company, the business representative, and the government decision maker could all be prosecuted for bribery, if the offer were made and accepted.

Several of my co-workers and I strongly support a certain political candidate. May we work together to support this candidate?

> Yes. SDI encourages participation in the political process. However, you may not use company funds, equipment, or materials to support the candidate, claim to represent the company's opinions or views of a candidate or issue, and you may not engage in political activities while you are on the job.

We will be attending a foreign trade show and have shipped our product displays from the United States. What if we experience unusual delays in getting our displays released by the customs officials of the foreign country? I'm told it is customary in this country to pay $100 to speed up processing of the customs document. Would this be proper?

> In some foreign cultures, it is customary and necessary to make payments called facilitating payments. These payments are for expediting routine governmental actions such as obtaining a permit or visa. In some cases, these payments may be illegal or improper. You are expected to use prudence when making facilitating payments, and you should contact the General Counsel if you have any questions or need advice.

## RIGHTS RESERVED

This Code is for the exclusive use of SDI. No part of this Code may be reproduced in any form by any means without SDI's prior written consent.

## POLICY TERMINATION

SDI reserves the right to amend, modify, revoke, suspend, or terminate this Code, in whole or in part, at any time with or without notice.

***THE ACKNOWLEDGMENT ATTACHED TO THIS CODE MUST BE SIGNED AND RETURNED.
FAILURE TO SIGN AND RETURN THE ACKNOWLEDGMENT MAY RESULT IN SUSPENSION
WITHOUT PAY OR TERMINATION.***

**Exhibit 4
Page 79**


Scientific Drilling/Applied Technologies

### ACKNOWLEDGMENT

By typing my name in the space provided below, I acknowledge that I have reviewed and agree with SDI's Code of Conduct. I also acknowledge that the Code of Conduct represents an outline of principles for individual and business conduct and do not, in any way, constitute an employment contract or an assurance of continued employment.

Except as specifically disclosed below, I am not aware of any violation of the Code of Conduct or any activity that could potentially violate the Code of Conduct by myself or anyone employed by or acting for SDI.

Name: _____         Date: _____ , 2011

Work Location: _____

Specified Violation:

_____

**ALL INFORMATION CONTAINED ON THIS ACKNOWLEDGMENT IS CONFIDENTIAL.**

**Exhibit 4
Page 80**

# EXHIBIT 5

# ADAMSKI MOROSKI MADDEN
# CUMBERLAND & GREEN LLP
ATTORNEYS AT LAW

Post Office Box 3835 • San Luis Obispo, California 93403-3835
T  805-543-0990 • F  805-543-0980 • *www.ammcglaw.com*

October 17, 2019

**VIA HAND DELIVERY TO COUNSEL**

Board of Directors
c/o Philip Longorio
Applied Technology Assoicates, Inc.
3025 Buena Vista Drive
Paso Robles, CA 93446

Re: **Demand For Corrective Action – Corporations Code Section 800**

To the Board of Directors:

This firm represents Matthew Van Steenwyk and Gretchen Van Steenwyk (collectively "Shareholders"). Through their trusts, the Shareholders own minority stakes of the Class B non-voting shares of Applied Technologies Associates, Inc ("ATA"). We write in reference to actions authorized and/or allowed by you with respect to ATA's relationship with Adelaida Cellars, Inc. ("ACI"). It is the Shareholders' position these actions have unjustly benefitted ACI to the substantial financial detriment of ATA at a critical juncture in its financial life. Pursuant to California Corporations Code section 800 et. seq., our clients hereby demand that ATA's Board of Directors take immediate corrective and remedial action against the controlling shareholder of ATA and/or responsible members of ATA's management team, restore the benefits diverted to ACI and enjoin the future diversion of ATA assets and resources to ACI for no compensation or compensation below market value. Our clients make their demand in the hope that they can avoid the need to file a derivative lawsuit.

We have examined ATA's financial statements for the five (5) year period beginning in 2014. ATA's ranching operations have sustained significant losses. In 2018, ATA's ranching operations lost $1,367,571, an increase of several hundreds of thousands of dollars from its loss in 2017. (*See* **Exhibit 1.**) At the last ATA shareholder meeting on August 1, 2019, CEO Philip Longorio stated that ATA's financial situation was "tough going" and that ATA "needed all the financial resources [it] could muster" to keep it afloat financially. The recently announced layoffs at ATA underscore this reality. During this period that ATA has been (and is) struggling for its financial life, your Board has apparently authorized multiple questionable financial arrangements and transactions between ATA and ACI. Those arrangements have materially contributed to losses on ATA's ranching operations side and, in the process, contributed to ATA's current financial problems[1]. At the same time, your Board has failed to address serious issues facing ATA and to execute business decisions warranted by ATA's financial condition.

---

[1] The losses incurred by ATA in its ranching operations appear to have resulted in a corresponding benefit to ACI.

**Exhibit 5**
**Page 81**

Board of Directors
c/o Philip Longorio
October 17, 2019
Page 2

One financial arrangement that has caused and is causing financial harm to ATA is an Agreement for Services effective April 1, 2016, signed by Elizabeth Van Steenwyk for ACI and Daniel Carter for ATA. Elizabeth Van Steenwyk is an ATA shareholder as Trustee of the Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust. She is also the owner of all Class A voting shares of ATA, making her the controlling shareholder. Therefore, she owed and owes ATA a fiduciary duty. Elizabeth Van Steenwyk purportedly signed the Agreement for Services whereby ATA agreed to provide ACI with human resources capital in the following areas: (1) financial and accounting services; (2) legal services; (3) administrative services; (4) construction and maintenance support; and (5) technical (computer) services. For all of these services from ATA, ACI has been obligated to pay only $2,000.00 per month. (*See* **Exhibit 2**.)

The Agreement for Services discussed in the preceding paragraph has created another issue of concern to the shareholders which your Board has never acknowledged, let alone addressed. Elizabeth Van Steenwyk purportedly signed the Agreement for Services shortly before she was, as a result of a medical referral by Dr. Kedrin Van Steenwyk, declared incompetent. Copies of the reports of Dr. Jonathan Mueller, dated May 17, 2016, and Dr. John Justin Davis, dated May 19, 2016, are attached hereto collectively as **Exhibit 3**[2]. Shortly after this report was issued, Dr. Kedrin Van Steenwyk was given power over Elizabeth Van Steenwyk's affairs. The timing of the Agreement for Services and incompetency assessment, raises a serious issue regarding the validity of the Agreement for Services, as well as other issues, which your Board has not addressed.

Another arrangement that has caused ATA financial harm involves the Grape Purchase Agreement between ACI (purchaser) and ATA (seller) executed in late 2016. It was executed by Philip Longorio on behalf of ATA. Dr. Kedrin Van Steenwyk executed the contract on behalf of ACI. As stated above, Dr. Van Steenwyk is a Board member of ATA. She also is the controlling shareholder of ATA through the power of attorney she holds regarding Elizabeth Van Steenwyk, the mother of the Shareholders and Dr. Van Steenwyk. Further, Dr. Van Steenwyk is officer and director of ACI. Finally, as stated, through her power of attorney, Dr. Van Steenwyk controls the controlling shareholder of ACI[3]. In short, Dr. Van Steenwyk owed and owes competing fiduciary duties to both ATA and ACI, and to the shareholders of both entities. Notwithstanding Dr. Van Steenwyk's multiple conflicts of interest, your Board approved the Grape Purchase Agreement which contemplated the following terms: (1) that ATA would bear all costs of delivery of the grapes; (2) that ATA would bear all costs of labor and harvesting of

---

[2] It is the Shareholders' understanding that one or both of these doctors are friends and /or colleagues of Dr. Kedrin Van Steenwyk.

[3] The controlling shareholder of ACI is KMBG, LLC, a Colorado limited liability company. KMBG, LLC is controlled by Dr. Kedrin Van Steenwyk as a result of the power of attorney giving her control over the affairs of Elizabeth Van Steenwyk.

**Exhibit 5**
**Page 82**

Board of Directors
c/o Philip Longorio
October 17, 2019
Page 3

the grapes; (3) that ACI had unlimited right of entry onto ATAR property related to the grapes; and (4) that ATA would sell the grapes to ACI at less than fair market value.  (*See* **Exhibit 4**.)

In addition to the foregoing financial arrangements and transactions, there are multiple additional suspect financial transactions that the Shareholders have been attempting to learn the details of through their multiple requests for corporate information under California Corporations Code section 1601.  These other transactions include, but are not limited to, the following:

- The disappearance/erasure of the inter-company payable owed by ACI to ATA between 2016 and 2017 (*See* **Exhibit 5**);

- In years prior to 2016-2017, the payable was continually renegotiated and remained unpaid, to the detriment of ATA;

- The advance by ATA of funds to ACI and its principal shareholder, KMBG, to fund their operating costs (*See* **Exhibit 6**);

- The running of aircraft leasing expenses incurred for the benefit of ACI through ATA (*See* **Exhibit 7**); and

- The unanswered questions involving Stoneway Properties, its relationship with ATA, the transactions that have been consummated in its name and the individuals/entities that paid for and benefitted from those transactions

Your Board has failed to execute necessary business decisions concerning its relationships with ACI and KMBG in the face of ATA's consistent financial losses.  While the Board has discussed selling off its non-core ranching and vineyard operations, it has taken no reasonable and good faith steps to effect those sales on the open market.  The only potential sale that has been discussed is the proposed sale to insider Dr. Kedrin Van Steenwyk.  Further, we recently obtained information indicating that a substantial player in the San Luis Obispo County vintners and growers industry approached Dr. Van Steenwyk about ATA's interest in selling one or more of its wine grape properties.  Dr. Van Steenwyk apparently rebuffed the inquiry on the ground that she was working on her own plan to purchase the properties.  We must assume Dr. Van Steenwyk did not take the issue to your Board.

The financial arrangements and transactions described above have benefitted ACI at the expense of ATA.  Further, they have financially hamstrung ATA at a time when its own President and CEO has stated, at the recent annual shareholders' meeting, that he is searching for any and all financial resources available to keep ATA operating in the black.  In short, your Board has effectively given away, or allowed its majority shareholder and/or its fellow Board member Dr. Kedrin Van Steenwyk, to give away ATA's goods and services to ACI for nothing or, at minimum, at significantly less than their value. In the process, ATA's Board has allowed costs to be piled up in a line item of ATA's financials that is one of ATA's most significant

**Exhibit 5**
**Page 83**

Board of Directors
c/o Philip Longorio
October 17, 2019
Page 4

financial drains. Our clients believe these actions have caused ATA to lose value to the detriment of its shareholders and employees.

Our clients hereby make demand that this Board take immediate action to address the above issues, and to investigate and rectify what appear to be areas of self-dealing and breaches of fiduciary duties that have resulted in financial detriment to ATA and, in addition, to respond to the Shareholders' reasonable and repeated requests for corporate and financial information relating to ATA, including its request for ATA's Code of Ethics. The Shareholders further demand an accounting of the transactions with ACI and others under the arrangements mentioned above. They also demand that your Board take appropriate action to recapture anylosses from ACI, KMBG and/or the responsible members of ATA's management, and to provide assurances that any future dealings with ACI, KMBG and/or members of ATA's management must be at arms-length. At minimum, your Board needs to provide assurances that ATA will be allowed to market its grapes to buyers willing to pay fair market value, that ATA will be paid fair market value for all goods and services provided to ACI, that the requested records and the requested accounting will be provided and that fiduciary obligations and ATA's Code of Ethics will be observed going forward.

If this Board does not respond to this demand within 30 days, the Shareholders intend to file the appropriate lawsuit including direct claims and derivative claims in the name of ATA against those responsible for the conduct noted above. If you have any question, please feel free to contact the undersigned.

Very truly yours,

ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP

MARTIN P. MOROSKI

MPM:tf
Enclosures
G:\VanSteenwyk\Cor\Board of Directors Demand.docx

cc:     Clients (via email only)
        Thomas J. Madden, Esq. (via email only)
        Chase W. Martin, Esq. (via email only)
        George Olguin (via email only)

Exhibit 5
Page 84

# ADAMSKI MOROSKI MADDEN
# CUMBERLAND & GREEN LLP
### ATTORNEYS AT LAW

Post Office Box 3835 • San Luis Obispo, California 93403-3835
T  805-543-0990 • F  805-543-0980 • *www.ammcglaw.com*

November 22, 2019

**<u>VIA EMAIL ONLY</u>**

Roy E. Ogden, Esq.
Ogden & Fricks LLP
656 Santa Rosa St., Suite 2B
San Luis Obispo, CA 93401
Email: <u>rogden@ogdenfricks.com</u>

> Re:   **Request For Inspection Of Books And Records of Applied Technologies Associates, Inc. Under Corporations Code Section 1601; Demand For Corrective Action Under Corporations Code Section 800.**

Dear Roy:

Your clients authorized you to send me your letter of November 1, 2019.  Further, I assume that your clients are responsible for the content of the letter.  The letter is disappointing, to say the least.  It purports to be both a response to my clients' multiple requests for production of books and records under Corporations Code section 1601 and a response to my clients' demand for corrective action under Corporations Code section 800.  In fact, it is neither.

Your clients, the directors of Applied Technologies Associates, Inc. ("ATA") feign that they are unclear as to the ownership interest attributable to Gretchen Van Steenwyk-Marsh. Please advise as to whether that lack of clarity was developed after Vice President and General Counsel Daniel R. Carter emailed Gretchen Van Steenwyk-Marsh the attached shareholder and Board of Directors materials on April 30, 2019, July 15, 2019, and July 26, 2019, directly at her 'gmail' address.  (*See* **Exhibit 1** hereto).  Your clients are not taking this matter seriously.

Your clients, as ATA's directors, received and presumably reviewed the financial statements of ATA in discharging their obligations, fiduciary and otherwise, to ATA and its shareholders.  The financial statement my clients rely on have been cited to you.  As directors, your clients also have access to the general ledger and other accounting documents maintained by ATA.  The information you request regarding the losses sustained by ATA is included in those financial statements and other financial documents.  The documents my clients possess have already been cited and/or provided to your clients.  The balance of the documents that bear on the issue that your clients feign ignorance of have been requested, but not produced.  (*See* 7/24/19 Moroski letter, ¶¶ 6(k), 7(f) and 8(h).)  Your clients are not serious about this matter.

Paso Robles Office:  1948 Spring Street • Paso Robles, CA 93446-1620 • T 805-238-2300 • F 805-238-2322

**Exhibit 5**
**Page 85**

Roy E. Ogden, Esq.
November 22, 2019
Page 2

Your clients continue to ignore the issues my clients raise as to the Agreement for Services that was executed by Elizabeth Van Steenwyk on behalf of ATA the month after she first exhibited documented signs of mental incapacity (*see* 10/17/19 Moroski letter, Ex. 3, p.1) and the month before she was diagnosed as lacking capacity by two different doctors. What difference does it make that a similar arrangement had been in place since 2013? Germane to my clients' demand under Section 800, what have your clients, the directors of ATA, done to investigate and analyze the arrangement and its financial impact on ATA's bottom line since 2013 and/or the implications of the fact that ATA has, since 2016, provided services that my clients believe are worth more than $2000 per month pursuant to an arguably void or voidable contract? By reason of the fact that ATA did not produce corporate books and records relating to the services provided pursuant to the Agreement for Services (*see* 7/24/19 Moroski letter, ¶¶ 6(d) and (e)), my clients conclude that the withheld documents do not support your clients' position.

Your clients are simply not telling the truth about the Grape Purchase Agreement. ATA, through its Board, has authorized the sale of wine grapes grown on ATA's property to Adelaida Cellars, Inc. ("ACI") for less than their market value. My clients know that ACI resells those grapes to third parties for more than twice the amount ACI pays for them. (*Compare* Ex. 1 to 7/24/19 Moroski letter *with* **Exhibit 2** hereto.) Further, my clients believe that ATA representatives know about this wrongful and inappropriate distribution of the Company's assets to only select shareholders by reason of the fact that they have been invited to attend, and have attended, ACI director meetings where the subject of ACI's resale of wine grape to third parties has been discussed. Your clients' willingness to attempt to deceive my clients about this subject further supports the conclusion that your clients are not taking this matter seriously.

Your clients, as directors of ATA, are aware of my clients' multiple requests for financial information explaining the disappearance of the inter-company payable and the advances to ACI and KMBG. (*See* 7/24/19 Moroski letter, Ex. 3.) The information has not been produced. Your clients now suggest that my clients accept your clients' conclusory statement that the inter-company payable and advances to ACI/KMBG have been paid off, because they say it has been paid off. Even if it has been paid off, my clients are entitled to know the source of the funds used to retire the payable. Your clients are not taking this matter seriously.

Your clients' requests for clarification about the aircraft leasing expenses and Stoneway Properties issues are disingenuous, at best. Requests for information under Corporations Code section 1601 have been made. (*See* 7/24/19 Moroski letter, ¶¶ 6(k) and 8(h).) ATA has stonewalled and refused to produce the requested information.

**Exhibit 5**
**Page 86**

Roy E. Ogden, Esq.
November 22, 2019
Page 3

Your clients' purported requests for clarification regarding the potential sale of the ranch properties underscores, to my clients, that the demand for corrective action under Corporations Code section 800 has not been acted upon. The board of ATA should have known about Kedrin Van Steenwyk's proposal to my clients about the sale of the ranches. (*See* 7/24/19 Moroski letter, Ex. 3.) The request for an analysis by my clients of the pros and cons of selling the ranch properties again indicates that your clients are not taking this matter seriously.

Your clients have now produced, after over a month since it was first requested, a copy of the Code of Ethics for SDI, albeit an unsigned copy. It includes the following provisions which may bear on issues in this matter:

> "...services and labor of other SDI [and ATA] employees, must be used only for legitimate business purposes on behalf of SDI [and ATA].... Employees may not take for themselves personally opportunities that are discovered using SDI property or information or which arise due to their position at SDI."
>
> ...
>
> "...[it is] against SDI [and ATA] policy, and in some circumstances illegal, for any employee to cause books and records to be inaccurate in any way...setting up unauthorized funds or accounts..."

Your clients should understand that my clients, collectively, own a small fraction of 1% of KMBG LLC, the sole shareholder of ACI. Kedrin Van Steenwyk, on the other hand, controls KMBG through her control over Elizabeth Van Steenwyk's interest in KMBG. Through her control over that interest, Kedrin Van Steenwyk controls ACI. Kedrin Van Steenwyk similarly controls ATA. However, in contrast to their small ownership interest in ACI, my clients own a total of 50% of the outstanding class B shares in ATA. Accordingly, any economic damage resulting from the diversion of ATA assets to ACI, Par Ranch and/or Hilltop Ranch, and/or any misuse of ATA resources, falls disproportionately on my clients' shoulders. Your clients' fiduciary obligations demand that they recognize this fact and act accordingly.

**Exhibit 5**
**Page 87**

Roy E. Ogden, Esq.
November 22, 2019
Page 4

Your clients have not provided my clients with the information requested under Corporations Code section 1601. Your clients have not taken the actions my clients demanded they take under Corporations Code section 800. Your clients dismissed my clients' proposal for a tolling agreement and appear uninterested in the mediation concept I discussed with you. Accordingly, my clients have concluded that they must pursue their litigation options.

Very truly yours,

ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP

MARTIN P. MOROSKI

MPM:tf
Enclosures
G:\VanSteenwyk\Cor\Ogden 112219.docx

cc:      Clients (via email only)
         Thomas J. Madden, Esq. (via email only)
         Chase W. Martin, Esq. (via email only)
         George Olguin (via email only)

**Exhibit 5**
**Page 88**